# UNITED STATES AND INTERSTATE COMMERCE COMMISSION *v.* BUTLER COUNTY RAILROAD COMPANY.

APPEAL FROM THE UNITED STATES COMMERCE COURT.

No. 837.   Argued April 13, 1914.—Decided May 25, 1914.

The *Tap Line Cases, ante,* p. 1, followed to the effect that:
  The fact that the same ownership controls the freight offered
  and the stock of a railroad company which is a common carrier,
  does not justify a different rate imposed upon the same kind of
  traffic.
  Under the Commodities Clause it is not unlawful for a common
  carrier to carry lumber owned by it, and until the law otherwise
  provides, it may treat freight owned by it in the same manner as
  like freight independently owned.

If the division of rates between a trunk line and a common carrier controlled by the same interest as controls the bulk of the freight moved by the carrier, is a mere cover for rebates and discriminations, the Interstate Commerce Commission has power to prevent such practices.

209 Fed. Rep. 260, affirmed.

THE facts, which involve the status of a lumber tap line and the powers of the Interstate Commerce Commission in regard to establishment of joint rates thereover, are stated in the opinion.

*Mr. Blackburn Esterline,* with whom *The Solicitor General* and *Mr. Karl W. Kirchwey* were on the brief, for the United States.

*Mr. Charles W. Needham,* with whom *Mr. Joseph W. Folk* was on the brief, for the Interstate Commerce Commission.

*Mr. William A. Glasgow, Jr.,* with whom *Mr. James M. Beck* was on the brief, for appellee:

The Commerce Court had jurisdiction of the complainant's bill and power to grant the relief prayed.

The Interstate Commerce Commission by its supplemental report of May 14, 1912, finds that the Butler County Railroad Company is a common carrier subject to the Act to Regulate Commerce.

The Interstate Commerce Commission required the Butler County Railroad Company, with the St. Louis & San Francisco Railroad Company and the St. Louis, Iron Mountain and Southern Railway Company, respectively, to reëstablish the through routes and joint rates theretofore in effect "in accordance with their respective tariffs," thereby fixing what was and is the proper and legal joint rate on lumber and forest products, from stations on the Butler County Railroad.

Having fixed the proper and legal joint rate on lumber and forest products, the Commission had no power to prescribe the "proportion or division of such rate. to be received by each carrier party thereto," unless the carriers "shall fail to agree among themselves upon the apportionment or division thereof."

It was beyond the power of the Commission to require that the Butler County Railroad Company should not receive out of the joint rate a greater division that $1.50 per car on lumber and forest products carried for the Brooklyn Cooperage Company, when at the same time providing for proper divisions of the joint rate to the Butler County Railroad Company on traffic carried for other shippers under the same tariffs containing the provision as to milling in transit.

In support of these contentions, see Act to Regulate Commerce, §§ 1 and 15; *Central Yellow Pine Ass'n* v. *Vicksburg S. & P. R. Co.,* 10 I. C. C. 193; *Chicago & N. W. Ry. Co.* v. *Osborne,* 52 Fed. Rep. 912; *S. C.,* 146 U. S. 354; *Crane Railroad Co.* v. *Phila. & Reading Ry. Co.,* 15 I. C. C. 248; *Division of Joint Rates,* 10 I. C. C. 385; *Hooker* v. *Knapp,* 225 U. S. 302; *Int. Com. Comm.* v. *Nor. Pac. Ry. Co.,* 216 U. S. 538; Judicial Code of March 3, 1911, § 207; *Malvern &c. R. R. Co.* v. *Chicago &c. Ry. Co.,* 182 Fed. Rep. 685; *Procter & Gamble* v. *United States,* 225 U. S. 282; *Re Allowances to Elevators,* 14 I. C. C. 309; *Star Grain Case,* 17 I. C. C. 338

MR. JUSTICE DAY delivered the opinion of the court.

The appellee, the Butler County Railroad Company, filed with the Interstate Commerce Commission its petition asking for the reëstablishment of through routes and joint rates with certain trunk lines, which was consolidated with and decided upon the same record as the complaints before the Commission in the *Tap Line Cases* involved in

the previous cases, Nos. 829 to 836, just decided, *ante*, p. 1. The general statement of the Commission in its report and supplemental report filed April 23, and May 14, 1912 (23 I. C. C. 277, 549) referred to in those cases preceded the following findings of fact:

The Butler County Railroad Company, the Brooklyn Cooperage Company, which owns the Railroad Company, and the Great Western Land Company, owning most of the timber reached by the railroad, are all subsidiaries of the American Sugar Refining Company.

The tap line, which was acquired from the Cooperage Company, consists of a section of track at Linstead, near Poplar Bluff, Missouri, extending into the plant of the Cooperage Company and connecting it with the St. Louis, Iron Mountain & Southern Railway and the St. Louis & San Francisco Railroad, which are within three-quarters of a mile of the plant, and the principal track extending about seven miles from Lowell Junction, a station on the Iron Mountain 7½ miles from Poplar Bluff, to Baileys, with a branch about 3 miles from Rossville, an intermediate point, and with trackage rights over unincorporated spurs from Baileys belonging to the Cooperage Company, and over the Iron Mountain from Lowell Junction to Poplar Bluff, paying for the latter 65c a train mile for 25 cars. It has 2 locomotives, 2 passenger coaches, 3 cabooses and about 100 freight and log cars.

The tap line hauls the logs, all of which are hardwood, from a connection with the unincorporated track to Lowell Junction, then over the Iron Mountain to Linstead and thence to the mill over its own track, where they are unloaded by the Cooperage Company. The regular manufacturing rate under the Missouri distance tariff is charged the Cooperage Company by the tap line, 1 to 1½c per 100 pounds, approximately $4 per car. The loaded cars are switched to the Frisco or Iron Mountain, less than one

mile, and the appellee receives from them an allowance of from 2 to 5c per 100 pounds. The rates from tap line points, including the mill at Linstead, are in all cases 2c higher than the rates of the trunk lines from Poplar Bluff, excepting to New Orleans and New York, to which points most of the shipments of the Cooperage Company go, and to which Poplar Bluff rates apply.

One hundred and eighty-four thousand six hundred and eighty-eight tons of forest products and 2,475 tons of other freight were hauled during the year ending June 30, 1910; of the first amount 107,527 tons being furnished by the controlling interests, 77,161 tons by outsiders, but all the timber coming from the lands of the Great Western Land Company, and of the miscellaneous freight 1,195 tons of inbound machinery and coal being for the proprietary companies. Passenger revenues were $4,104.22. Three mixed trains in each direction are operated daily between Linstead and Melville, a point beyond Baileys on the unincorporated track, two being used principally for passenger service.

The Great Western Land Company furnishes timber to several independent industries on the tracks of the tap line near Linstead, the tap line switching their product to the trunk lines. Their factory sites are leased from the Cooperage Company, the purpose of making such leases being to secure traffic upon which the tap line might obtain divisions. A few independent producers on the main track of the tap line team their supplies and ship their products over the tap line. They pay the local rate of the tap line and the trunk line rate, or a through rate that is 2 cents higher than the Poplar Bluff rate.

The Commission found that the Sugar Company, having refineries at New Orleans and New York, so adjusted the rates to such places as to induce movements to them and restrict movements to other points, and limited the amount the tap line might receive on proprietary traffic

moved from the mill to the Iron Mountain and Frisco to a switching charge fixed at $1.50 per car.

The order of the Commission, so far as it related to the appellee, required the trunk lines named to reëstablish and maintain with it the through interstate routes and joint rates in effect, in accordance with their respective tariffs filed with the Commission on April 30, 1912; provided that the rates on yellow-pine lumber and articles taking the same rates from points on the line of the appellee should not exceed the current rates in effect from the junction points, and

"Provided further, That the allowances or divisions out of such joint rates to be paid by said principal defendants [the trunk lines], respectively, to the said last-named parties to the record [the appellee and others] on the products of the mills of the said respective proprietary companies named in said report shall not exceed the divisions or allowances specified in the aforesaid supplemental report of the Commission [in this instance the switching charge of $1.50 per car] which are hereby fixed as maximum divisions or allowances thereon, until further order, the Commission finding upon the record that any allowances or divisions in excess thereof result in undue preferences and unjust discriminations and are unlawful."

The appellee then brought suit in the United States Commerce Court seeking to enjoin and annul the order of the Commission in so far as it forbade a division out of the joint rates of more than $1.50 per car. The Commerce Court held, after stating that the Commission had found this road to be a common carrier both of logs and of lumber, and not a plant facility, but had denied it the right to receive either a division or allowance for the log traffic and only an allowance for the lumber traffic of the proprietary mill, while permitting it to receive a division out of the joint rate for both log and lumber traffic of non-proprietary companies, that the reasons stated in the other

opinion applied here and that the distinctions made were arbitrary and the order beyond the power of the Commission, and the Commerce Court decreed that that part of the order of the Commission above quoted, with reference to the divisions and allowances to be made out of the joint rates, be vacated and set aside as to the appellee. 209 Fed. Rep. 260.

The United States and the Interstate Commerce Commission, the latter having intervened in the proceeding in the Commerce Court, prosecuted this appeal.

This case was argued on the same day with the other tap line cases, and much that is said in those cases is applicable here. The Commission ordered the restoration of the schedule of tariffs of April 30, 1912, thus recognizing the right of this road to participate in joint tariffs with other common carriers and to receive a division out of the joint rates. But the Commission excepted from this right traffic offered to the appellee by its proprietary company, evidently upon the theory enforced in the other cases before the Commission that as to such traffic the Railroad Company had not the rights of a common carrier, and as to such traffic limited the compensation of the Railroad Company to a switching charge of $1.50 per car.

We think the Commerce Court correctly held that the fact that the same ownership controlled the freight offered and the Railroad Company would not justify the different rate imposed upon the same kind of traffic. Under the Commodities Clause of the Act to Regulate Commerce, as amended (June 29, 1906, c. 3591, 34 Stat. 584), the right of a carrier, as we have said in the former opinion in these cases, to carry this class of freight although owned by it, is recognized as lawful. This being so, such carrier, until the law otherwise provides, has the right to treat such freight in the same manner as it does like freight independently owned. Of course, if the division of the rates

is a mere. cover for rebates or discriminations, such practices may be controlled by the Commission under the authority given to it in the Act to Regulate Commerce.

We find no error in the disposition the Commerce Court made of this case, and its judgment is therefore

*Affirmed.*