CAROLINA SPRUCE CO. *v.* BLACK MOUNTAIN R. CO.

(*Knoxville.* September Term, 1917.)

1. **CONTRACTS.** Construction of logging road. Extension of time. ''Act of God.'' ''Causes beyond its control.'' ''Unavoidably prevented.''

Under a railroad's contract to construct and put in operation a road from a timber tract to a main line junction, the provision, unless prevented by other "causes beyond its control," did not refer only to a cause which was an "act of God," that term meaning a happening due directly and exclusively to a natural cause or causes in no sense attributable to human agencies, which could not be resisted or prevented by the exercise of such foresight, prudence, and care as the situation might have called into exercise; but the provision was synonymous with "unavoidably prevented," the words "beyond control" implying a pledge to exercise human agency to the point of excluding negligence, so that unanticipated trouble and delay encountered in a cut by reason of a peculiar mud or clay called "gumbo," much harder to remove than rock, entitled the railroad to thirty days' additional time to finish construction. (*Post, pp.* 142-147.)

Case cited and distinguished: Chicago, etc., R. Co. v. U. S., 194 Fed., 342.

2. **CONTRACTS.** Construction of logging road. ''Constructed.'' ''Completed.''

Where the road had until June 1st to finish construction of the line, the construction of a road in which the curves were fully tied, but the straight portions of which were half tied, but which enabled an engine and cars with additional ties to be sent forward, and put it in condition to bear any traffic tendered by the lumber company, and where heavy mill machinery was hauled over the line early in April, and the roadway was thereafter steadily improved, it was constructed and placed in operation for

general traffic; the word "constructed" having substantially the signification of the word "completed." (*Post, pp.* 147-150.)

Cases cited and approved: Chicago, K. & W. R. Co. v. Makepeace, 44 Kan., 676; Guillory v. Avoyelles R. Co., 104 La., 11; Freeman v. Matlock, 67 Ind., 99; So. Kan. & P. R. Co. v. Towner, 41 Kan., 72; Manchester, etc., R. Co. v. City of Keene, 62 N. H., 120.

Case cited and distinguished: Tower v. Detroit, etc., R. Co., 34 Mich., 328.

3. **CONTRACTS.** Construction of logging railroad. Operation. Equipment. ''Constructed.'' ''Completed.''

The road was constructed and placed in operation, even though the contractor, which had purchased engines, was dependent upon its connecting carriers for its freight car supply, as the word "completed" did not include the equipment of the road with the contractor's own rolling stock, especially where there was no express contract provision that the railroad would purchase rolling stock. (*Post, pp.* 150-152.)

Cases cited and approved: Courtright v. Deeds, 37 Iowa, 503; De-Graff v. St. Paul & P. R. Co., 23 Minn., 144.

4. **CARRIERS.** Construction of logging road. Contract. Freight Rates.

Under a railroad's contract to construct a logging railroad to connect with a main line, and to transport lumber, etc., to a junction on the main line at four cents per hundred pounds in excess of the rates currently in force from the junction, the railroad's charge and collection of four cents, plus the regular through rate charges from the junction, and its receipt of three cents from the connecting carrier for producing the traffic, was authorized, provided there was no discrimination between shippers. (*Post, pp.* 152-154.)

5. **CARRIERS.** Rates. Originating traffic.

The established and well-known practice among railroad companies to allow to the carrier originating the business an advantage in the distribution or division of the rate has been recognized and by fair inference upheld by the interstate Com-

Carolina Spruce Co. v. Black Mountain R. Co. ·

merce Commission and the United States supreme court. (*Post,* · *pp.* 154-156.)

Cases cited and approved: U. S. v. Louisiana & P. R. Co., 234 U. S.; 1; U. S. v. Butler County R. Co., 234 U. S.; 29.

Cases cited and distinguished: Northern Pine Manf. Ass'n v. Chicago, etc., R. Co., 33 Int. Com. Com'n R., 360; In re Alleged Unreasonable Rates on Meats, 23 Int. Com. Com'n R., 657.

6. **CARRIERS. Rates. Discrimination.**

Where a railroad contracted to construct a line from a main line junction to a timber tract, and to transport lumber, etc., at a certain rate, the shipper, if entitled to the part of the joint through rate paid by the connecting carriers to the railroad for originating traffic, would have an undue and forbidden preference over other shippers, and a contractual obligation, that it should receive such distribution would not justify such discrimination, and a State court would not enforce such a contract. (*Post, p.* 157.)

Cases cited and approved: So. R. Co. v. Linear, 138 Tenn., 543; Dayton Coal & I. Co.·v. Cincinnati, etc., R. Co., 134 Tenn., 221; Roberts v. Nashville, etc., R. Co., 135 Tenn., 48; Louis. & N. R. Co v. Maxwell, 237 U. S., 94.

7. **CONTRACTS. Construction. Validity.**

Where a contract may fairly be construed not to violate the law, the courts should incline to give it that construction, and thus maintain its validity. (*Post, pp.* 157, 158.)

Cases cited and approved: Gernt v. Floyd, 131 Tenn., 122; Morgan Bros. v. Coal & Iron Co., 134 Tenn., 228.

8. **EVIDENCE. Filing evidence of concurrence in joint rates. Presumption.**

It will be presumed that a carrier has complied with the law in respect to the filing of evidence of its concurrence in joint rates established by other carriers, assuming to act for all of those named as participants. (*Post; pp.* 158, 159.)

Cases cited and approved: Louisville & N. R. Co. v. Hobbs, 136 Tenn., 512; Cincinnati, etc., R. Co. v. Rankin, 241 U. S., 319.

9. **INJUNCTION.** Decree. Reserving right to correct claim.

On a bill by a lumber company to enjoin a railroad's sale of collateral upon default in the payment of a note given the railroad for constructing a logging roai, where it appeared that complainant might have a just claim in some amount not shown by the record for an overcharge on cars equipped with standards placed on gondola and flat cars, the decree entered should reserve to it the right to litigate such claim in a court, or before the Interstate Commerce Commission, as it might be advised. (*Post*, *p.* 159.)

---

FROM WASHINGTON.

---

Appeal from the Chancery Court of Washington County.—HAL H. HAYNES, Chancellor.

HARR & BURROW, for appellant.

J. J. McLAUGHLIN, COX & TAYLOR and J. R. SIMMONDS, for appellee.

MR. JUSTICE WILLIAMS delivered the opinion of the Court.

The Carolina Spruce Company, a private corporation, having purchased a large boundary of timber in Yancey county, N. C., was desirous of securing railway facilities for its development. The tract was located about twenty miles from the Carolina, Clinchfield & Ohio Railway, a trunk line, and its development required the construction by the Spruce Company, or another, of a tap-line railroad over which the forest products, such as lumber, logs, acid

wood, etc., might be transported to some junction point on the Carolina, Clinchfield & Ohio Railway. The timber tract was located at or near the base of Black Mountain (Mt. Mitchell), one of the tallest peaks east of the Rocky Mountains, and a tap line to reach it would have to traverse a very rough territory. In order to induce the construction of such a line to the boundary, the Spruce Company offered a bonus to aid the Black Mountain Railway Company in the large expenditure of money such construction would call for.

Omitting to even outline previous contracts entered into in relation to the matter by the complainant and the defendant railway, and alleged breaches thereof by the Spruce Company, we believe it to be sufficient to say that on September 19, 1912, the two entered into an agreement, one of the clauses of which reads as follows:

"The railway company agrees that it will proceed forthwith to construct and place in operation a standard gauge line of railway from a point of connection with the line of the Carolina, Clinchfield & Ohio Railway at Black Mountain Junction to Pensacola, along the route to be selected by the railway company, . . . so that material and machinery of the Spruce Company, necessary for the erection of a sawmill and plant of the Spruce Company, may be transported over the same not later than March 1, 1913, and that the road will be in condition for general traffic not later than April 1, 1913

(later changed by the parties to May 1, 1913), unless prevented by weather conditions or other causes beyond its control.''

As a part of the bonus sum, a note of $10,000 was executed by the complainant company to the railway company, which note was secured by a pledge of first mortgage bonds of complainant. At the maturity of the note there was a claim of default in payment, and the collateral was advertised for sale.

The bill of complaint of the Spruce Company was filed to enjoin the sale of the collateral, and it challenged the right of the railway company to collect the note by an allegation that the contract had not been complied with by the railway company. It was alleged that the latter company was obligated to build and equip its line by a date fixed, but had itself made default and failed to earn the bonus, and had seriously injured complainant. Other allegations in -the bill and allegations and denials in an answer raised the issues discussed in the body of this opinion.

A cross-bill was filed by the railway company praying for appropriate relief.

In point of fact the railroad did not reach the terminus at or near Pensacola until after March 1, 1913, to wit, on March 22d or 24th of that year. Much proof was introduced touching the stages the construction work had reached on that date and later dates referred to below.

The railway company defended on the ground that a strict compliance within the contract limits

Carolina Spruce Co. v. Black Mountain R. Co.

of time (March 1, 1913, for transportation of sawmill outfit, and May 1st,. for general traffic) was "prevented by weather conditions or other causes beyond its control;" and it specified: (a) Bad weather in the winter of 1912-13; (b) scarcity of labor; (c) difficulty in getting a supply of ties for the laying of permanent tracks; and (d) unanticipated trouble and delay encountered in a cut called Summit Cut by reason of a peculiar mud or clay called "gumbo" discovered therein.

We agree with the chancellor in his findings of fact that specifications (a), (b), and (c) did not operate to allow the railway any extension of time for the construction work. So concurring, we shall not burden this opinion by a discussion of these questions of fact.

The chancellor expressed doubt as to the merits of the last specification (in relation to the "gumbo" material in the cut), whether it operated to extend the time. He resolved the doubt, however, against the railway company on the theory that the phrase, "unless prevented by other causes beyond its (the railway company's) control," refers only to causes which were the acts of God, or of public authority. Is the chancellor's view sustainable?

By "act of God" is meant a happening, due directly and exclusively to a natural cause or causes in no sense attributable to human agencies, which happening is not to be resisted or prevented by the exercise of such foresight, prudence, diligence, and care as

the situation of the defendant party may reasonably have called it to exercise.

Since human agency or intervention is to be excluded from creating or entering as an element into such an act causing injury, we have for consideration whether the contract phrase is the legal equivalent of the "act of God," as the chancellor held. We are of opinion that the phrase comes nearer to being synonymous with "unavoidably prevented," and that is can hardly be the equivalent of what is called the act of God; but it cannot mean less than that there must have interposed some hindrance which the railway company, as the actor party, could not foresee or overcome by the reasonable exercise of its powers and the use of the means and appliances that were, or in the exercise of commensurate care should have been, available. What is meant is that the happening must not have been occasioned in any degree by the want of such foresight, care, and skill as the law holds one in like circumstances bound to exercise. The words "beyond control" fairly imply a pledge to exercise human agencies to the point of excluding negligence under the above test, and if this be true human agencies are not excluded from consideration as factors.

In *Chicago, etc., R. Co.* v. *U. S.*, 194 Fed., 342, 114 C. C. A., 334, it was said in respect of the closely related phrase "unavoidable cause:"

"An . . . 'unavoidable cause' . . . is a cause which reasonably prudent and cautious men

Carolina Spruce Co. v. Black Mountain R. Co.

under like circumstances do not and would not ordinarily anticipate and whose effects under similar circumstances they do not and would not ordinarily avoid.''

The paucity of decisions construing the words ''beyond control'' and ''unavoidable cause'' in commercial and building contracts must be remarked.

Briefly summarized, the conditions encountered in the cut referred to were as follows: A material called ''gumbo,'' a blue mud or clay, was found in large quantity. This is described in the proof as being a very peculiar formation, much harder to remove than rock, requiring three or four times as long to remove, and costing about four times as much. Various appliances were used in efforts to take out this mud or clay. One witness testified:

''That he worked at Summit Cut from the time it was commenced until it was finished; that in the north end of the cut they struck a blue pipe clay, which was the biggest vein of this material that he ever saw; that is was blue, black mud, as stiff as it could be and so hard to handle that you could not do anything with it; that about half of the cut was composed of this clay; that dynamite would shoot it up in blocks—that is, if you loaded it heavy enough you could shoot it up in blocks, as big as a wagon bed; that it would spread it out and you would have to cut into it with shovels and cut it up and load it on the car; that you would have to take a paddle or your hand to pull it off the shovel; that they kept a tub

of water there to dip the shovels in so as to make the mud slip off; that you had to chain the dump cars to the rail in order to keep it from turning them over when they dumped the material because the material would stick to the cars and you would have to take a mattock and rake it off of the bed of the car; that when they first began the cut they commenced on each end and put in plows and scrapers to scrape it out and ran them as long as they could; that when they struck this pipe clay the horses mired down in it and they had to quit that.''

The use of wheelbarrows and then of a steam ditcher was resorted to, but the mud would stick to the dipper of the ditcher, and no speed could be made with it. A laborer would stick a pick in the clay, and it would take both of his hands to get it out without bringing any material with it. When it rained the clay would spread out and submerge the track, which had to be jacked up and other timbers placed under it. It was a difficult matter to hold laborers at work; at first they were paid a wage of a time and and a half, and before completion they were paid double time for work in this cut; and even with that the crew was constantly changing; few would work in the cut over a week at a time, making it necessary to carry a number of men as a reserve force. Work was prosecuted day, night, and on Sundays in efforts to remove this material.

The peculiar waxiness, stubborn nature and large quantity of this deposit were beyond reasonable

anticipation, found as it was deposited in a hill, and we think the failure to discover and overcome the difficulties incident to the deposit was not due to negligence on the part of the railway company, or its contractor, under the test above outlined.

The proof shows that the delay in the completion of the roadbed was on this account and amounted to at least thirty days (the railway claims sixty days); and we are of opinion that the railway company was entitled, by reason of the contract provision above quoted, to that additional time within which to finish the construction of its line of railway.

The chancellor held that the complainant had acquiesced in any failure to so complete and waived any damage sustained by it, and thus reached the same result so far as the disposition of the case is concerned.

But it is contended that the railroad was not constructed in a manner to comply with the contract, even after the expiration of such an additional period of thirty days—that not until August 10, 1913 was the roadbed surfaced, ballasted, and fully or adequately tied, and that not until then was the road constructed so as to be capable of safe operation. By the weight of the proof it appears that when track-laying reached the contract terminus at or near Pensacola on or a few days before March 24, 1913, most of the curves were fully tied, but the straight portions of the line were half tied; that is, ties were laid approximately four feet apart. It is shown,

however, that this is customary in railway construction work, since thereby an engine and cars loaded with additional ties could be sent forward over the line and the ties unloaded where needed and inserted at the regulation distance of two feet apart. Before the road was fully tied it was in condition to bear and carry any traffic tendered by the Spruce Company. The rails used were 85-pound steel rails, and these tended in themselves to make the roadbed reasonably stable for slow-moving trains.

It does not appear that any traffic was offered to the railway company by complainant during said thirty days extension period, which was declined. In fact, it appears that as early as the last days of April heavy mill machinery was hauled over the line for complainant, and thereafter the condition of the roadbed was steadily improved, as is above indicated.

Treating June 1, 1913, as the test date for the purpose, arrived at as above shown, was the road at that time constructed and placed in operation for general traffic, within the meaning of the contract? Yes, and prior thereto.

The word "constructed" in such a connection has been treated as having substantially the signification of the word "completed." The latter word has been construed in a number of reported cases, and certainly "constructed" can carry no stronger implication favorable to complainant Spruce Company.

In *Tower* v. *Detroit, etc., R. Co.,* 34 Mich., 328, in which the opinion was delivered by Chief Justice

COOLEY, it appeared that a note had been executed by Tower to aid in the construction of the railroad, in which note payment was to be made "provided said railroad be completed to Stanton May 1, 1873." The surfacing of the track was not completed by that date. It was said:

"Exception is taken to the judge's remark that the word 'completed,' when made use of in such a contract, may have a different meaning from what it would have in a contract for the construction of the· road; but in this he was doubtless correct. In a contract for construction it would mean a completion in accordance with specifications; but in a contract like the one in suit it is not likely the parties have any such exact completion in mind, and a less perfect construction may satisfy its intent, provided the road is in condition to be opened for regular passenger and freight traffic, and is actually in use. The purpose of such a condition, when embodied in a contract made in aid of the road, is accomplished when the road is thus put in condition for regular business."

Other cases are in accord in holding that even where there is a grant of public aid by a county or municipality to a railway company to secure the construction of its line, the word "completed" is held to be so far synonymous with "constructed" as not to be construed to require the road to be perfect on the date set for completion. If there is a substantial compliance and the road is fit to bear reasonably regular trains, carrying all freight and passen-

gers that offer, the grant is enforcible, through there be some lack in surfacing, ballasting, tieing, and though some portion of the work is intended to be replaced with other and better material. *Chicago, K. & W. R. Co.* v. *Makepeace,* 44 Kan., 676, 24 Pac., 1104; *Guillory* v. *Avoyelles R. Co.,* 104 La., 11, 28 So. 899; *Freeman* v. *Matlock,* 67 Ind., 99; *Southern Kan. & P. R. Co.* v. *Towner,* 41 Kan., 72, 21 Pac., 72; *Manchester, etc., R. Co.* v. *City of Keene,* 62 N. H., 120.

For a stronger reason would such a substantial compliance suffice where the contract is one that provides for the service of a single industry, rather than of the public at large. If the road was in condition to carry in reasonable safety complainant's products of logs and lumber, and its officers, agents, and employees, its object was attained. On the record it is not to be doubted that the road was constructed to that degree of completion on the true test date, and even prior thereto.

Another position sought to be maintained by complainant is that the railroad was not constructed and placed in operation as the contract contemplated, in that the defendant company never purchased any freight cars for use in transporting its forest products, and it is asserted that the failure of defendant to equip itself with rolling stock has proven most detrimental to complainant.

The record shows that for a freight car supply the railway company was dependent upon its connecting

carriers; but it is also shown that had it purchased such cars in number fairly commensurate with its mileage they would have been few in number, and these few when sent out on interstate journeys would be used by other railways, and could be caused to be returned with great difficulty. In fact it is apparent, if complainant's contention be correct, that an involved system of car accounting and tracing would have to be installed, the cost of which to the defendant would be greatly out of proportion to the benefits accruing to either party to the contract; and that even were this system established is would be impracticable to retain the company's own cars on its branch or tap line of railway. The contract is to be construed in the light of practical railway operation and management, as known to the business world. The railway company did purchase engines. There was no express provision in the contract that the railway company should purchase rolling stock, and none is to be implied from the undertaking on its part to construct and operate the line for the transportation of complainant's products.

Under car service association rules the use of the freight cars of, say the Carolina, Clinchfield & Ohio Railway, by defendant must be paid for by the defendant railway company, and such use is under a system that approximates a temporary letting, in legal effect.

A condition that a railroad shall be completed and the cars running to a certain place is complied

with by the running of hired cars. *Courtright* v. *Deeds,* 37 Iowa, 503; *Railroad* v. *Keene,* supra. Even the word "completed" in such a contract does not include the equipment of the road with the company's own rolling stock. *De Graff* v. *St. Paul & P. R. Co.,* 23 Minn., 144, 146.

We think the contention is without merit, and it appears to be unsupported by any authority.

We find ourselves unable to agree with the truly able chancellor in his ruling on another point:

One of the provisions of the contract relates to the freight rate to be charged by the railway company for the transportation of complainant company's products, and reads thus:

"And that it [the railway company] will transport lumber and forest products manufactured by the Spruce Company from properties now owned by it from said terminal [Pensacola] of said railway to the said junction on the line of Carolina, Clinchfield & Ohio Railway, and will charge the Spruce Company for the transportation of said manufactured lumber, the sum of four cents per hundred pounds in excess of the rates currently in force from Black Mountain Junction, North Carolina."

The railway company charged and collected the four cents, plus the regular through rate charges from Black Mountain Junction to the market terminals, and out of the regular rates from the junction received from the connecting carriers three cents for producing the traffic, thus taking from the two sources seven cents.

The chancellor sustained the contention of the Spruce Company to the effect that inasmuch as the Carolina, Clinchfield & Ohio Railway and the other common carriers participating in the haul allowed the Black Mountain Railway Company three cents per hundred pounds of complainant's products out of their own divisions of the total freight rate from said junction to the markets, the complainant is entitled to benefit by having the four-cent carriage charge named in the contract reduced by said three cents or to one cent per hundred. The chancellor was of opinion that the fair and reasonable construction of the contract is that the defendant railway company would accept through shipments from complainant, and would charge four cents in addition to what would have to be paid connecting carriers for the haul. The chancellor could not reconcile with good faith and fair dealing the railway company's claim that it is entitled to keep said three cents. "It was its duty," he recites in the decree, "to obtain the best rate possible, and any concession it may have gotten should inure to the benefit of complaint, its shipper, for whom it was acting in said matter."

We entertain the view that, in fixing four cents per hundred as its charge "in excess of the rates currently in force from Black Mountain Junction," the railway company was reckoning on a fixed rate for its own haul, and that the complainant contemplated the addition thereto of "the rates currently

in force" for or over the remainder of the route of transportation. The first was a fixed factor, the second or "stem rate" was not, but was subject to fluctuations. By what? Not the action of the defendant railway company, but the action of the participating carriers in naming through rates subject to the approval of the Interstate Commerce Commission. Interstate rates could not otherwise be "currently in force." We are unable to see how the shipper was concerned in the matter of the distribution of the total through rates as between the several carriers. The shipping public is interested in the total charge made for through transportation service, but not in the "divisions" made by and among the participating carriers.

It is a long-established and well-known practice among railway companies to allow to the carrier originating the business an advantage in such distributions or "divisions"—for creating, so to speak, the traffic. This practice, moreover, has been recognized and by fair inference upheld by the Interstate Commerce Commission and the supreme court of the United States.

In *Northern Pine Manuf. Ass'n* v. *Chicago, etc., R. Co.,* 33 Interst. Com. Com'n R., 360, there was under consideration rates on lumber from producing points in Michigan to consuming points in trans-Mississippi States, through the twin cities of St. Paul and Minneapolis. Upholding the reasonableness of the rates is was said:

"The through rates from the producing points are made by the addition of arbitraries to the so-called 'stem rate' of 18 cents per 100 pounds from the twin cities to both the upper and lower crossings of the Missouri river. Neither the arbitraries nor the 'stem rate' represent actual divisions of the through rates. In general the carrier which moves the traffic from the producing point to the twin cities receives more than the arbitrary, and the carrier from the twin cities to destination receives less than the 'stem rate.' "

Again, in the case *In re Alleged Unreasonable Rates on Meats,* 23 Interst. Com. Com'n R., 657:

"It is necessary to say that, in making the above observations as to the additional allowance for the two-line haul when long distances are involved, it was not intended to intimate that a short line should be confined in its division of the joint rate to merely the amount which an application of the mileage scale would produce. What is a fair division between carriers is to be determined in each case upon the merits of that particular case."

In *U. S.* v. *Louisiana & P. R. Co.,* 234 U. S., 1, 34 Sup. Ct., 741, 58 L. Ed., 1185, and *U. S.* v. *Butler County R. Co.,* 234 U. S., 29, 34 Sup. Ct., 748, 58 L. Ed., 1196, it was contended by counsel that where the commission had fixed a joint or through rate on forest products, it had no power to prescribe the proportions or divisions of such rate to be received by each carrier party thereto, when the latter

had agreed among themselves, but the court held that this power existed so far as to prevent undue preferences to one shipper over another; and, referring to allowances made to tap-line railways by trunk lines, said:

"If the divisions of joint rates are such as to amount to rebates or discriminations in favor of the owners of the tap lines because of their disproportionate amount in view of the service rendered, it is within the province of the commission to reduce the amount so that the tap line shall receive just compensation only for what it actually does."

Thus, as we conceive, is recognized the right of trunk line participants to compensate a tap, branch, or feeder line of railway on the basis of just compensation for services performed, including in the reckoning an allowance for originating the traffic. Indeed, the sole limitation on the power of the carriers to contract in that regard seems to be fixed on the line of no subversion of the act of Congress by causing, in effect, a discrimination as between shippers.

If for any reason the three-cent concession was illegally absorbed by the defendant railway company, it would not inure to the benefit of complainant, but would stand to be returned to those participants in the carriage who by law were clearly entitled, and, indeed, compelled, to collect the full interstate rate which was currently in force from Black Mountain Junction.

Viewing and testing from another angle these contentions of the parties, a like result is reached: To adopt the complainant's construction of the contract on this point would make that contract contravene the Interstate Commerce Act, and lead to the contract's denunciation as being in preferential favor of the complainant as a shipper. If the three-cent portion of the joint through rate should inure to the benefit of complainant, it would in so far have an undue and forbidden preference over other shippers of lumber and forest products located on the defendant's line of railway. *Southern R. Co.* v. *Linear,* 138 Tenn., 543, 198 S. W., 837; *Dayton Coal & I. Co.* v. *Cincinnati, etc., R. Co.,* 134 Tenn., 221, 183 S. W., 739, affirmed 239 U. S., 446, 36 Sup. Ct., 137, 60 L. Ed., 375; *Roberts* v. *Nashville, etc., R. Co.,* 135 Tenn., 48, 185 S. W., 69; *Louis. & N. R. Co.,* v. *Maxwell,* 237 U. S., 94, 35 Sup. Ct., 494, 59 L. Ed., 853, L. R. A., 1915E, 665. A contractual obligation cannot support or justify such unlawful discrimination; otherwise the policy of the law could be easily defeated. A State court would not assume jurisdiction and grant complainant a recovery on such an agreement in violation of federal laws.

Where a contract may fairly be construed not to be violative of law, the courts should incline to give it that construction, and thus maintain its validity. *Gernt* v. *Floyd,* 131 Tenn., 122, 174 S. W., 267; *Morgan Bros.* v. *Coal & Iron Co.,* 134 Tenn., 228, 262, 183 S. W., 1019, Ann. Cas., 1917E, 42. That such construction may, and we think must, be given the instant contract, we have already seen.

In relation to these matters complainant company insists that there is no proof that the Black Mountain Railway Company became a "participating carrier," so as to make operative the principles just adverted to. It is argued that though the published lumber tariffs of the Carolina, Clinchfield & Ohio Railway name the Black Mountain Railway Company as a participating carrier, yet formal concurrence on the part of the latter is not shown. It is urged, further, that the Hepburn Act (U. S. Comp. St. 1916, section 8563 et seq.) means that the Interstate Commerce Commission 'shall require participating carriers to file with that body evidence of their acceptance of or concurrence in joint rates published by other carriers assuming to act for all of those named as participants. Counsel of complainant argue that the presumption is that said commission has complied with the law by calling for the filing of evidence of such concurrence, because it was its duty to do so.

However, a like presumption obtains that the defendant railway company on its part complied as was its duty. We held in *Louisville & N. R. Co.* v. *Hobbs,* 136 Tenn., 512, 190 S. W., 461, following *Cincinnati, etc., R. Co.* v. *Rankin,* 241 U. S., 319, 36 Sup. Ct., 555, 60 L. Ed., 1022, L. R. A., 1917A, 265, that it would be presumed that an interstate carrier complied with the law in filing and publishing a schedule of rates. The same reasoning requires the court to presume right conduct and compliance with lawful demands in respect of the filing of evidence

of its concurrence by the defendant railway company.

It follows, therefore, that the chancellor was in error in decreeing in favor of complainant on the claim of right to take the benefit of the three-cent concession to the railway company.

A further contention remains for disposition: Complainant in its assignments of error insists that it has been overcharged on cars that were equipped by it with standards placed on gondola and flat cars to hold lumber in place while in transit. The claim is that under certain conditions 500 pounds per car so equipped must be deducted from the weight of lumber-loaded cars going to destination points out of the State of North Carolina, the tariff stipulations of the regulating authority so providing. It appears that complainant may have a just claim in some amount, not shown in the record before us, under this head; and the decree to be entered in this court will reserve to complainant the right to litigate the same hereafter, in a court, or before the Interstate Commerce Commission for reparation, as it may be advised. We do not adjudicate whether the courts of this State would have jurisdiction in any event of such claim, but leave that and all other phases at large and unprejudiced by anything decreed in this cause.

A decree will pass modifying the decree of the chancellor in the respects set out above, and awarding accordant relief. Costs of the cause, including the costs of the appeal, will be paid two-thirds by complainant, and one-third by the defendant railway company.