IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 6, 2010 Session

## WENDELL P. BAUGH, III ET AL. V. HERMAN NOVAK ET AL.

**Appeal by Permission from the Court of Appeals
Chancery Court for Williamson County
No. 32631      Timothy L. Easter, Chancellor**

_____

**No. M2008-02438-SC-R11-CV - Filed May 20, 2011**

_____

This appeal raises the issue of whether a contract for the sale of an interest in a corporation and related indemnity agreements are unenforceable because they are contrary to public policy. The sellers of the corporate interest filed suit against the purchasers in the Chancery Court for Williamson County seeking damages for the purchasers' alleged breach of their indemnity agreement. The purchasers counterclaimed asserting, among other things, that the sellers had fraudulently induced them to purchase the interest in the corporation. Following a bench trial, the trial court awarded a $201,715.50 judgment to the sellers and dismissed the purchasers' counterclaim. On appeal, the Court of Appeals, on its own motion, invalidated the stock purchase agreement and the related indemnity agreements on the ground that they were contrary to the public policy reflected in Tenn. Code Ann. § 48-16-208 (2002). *Baugh v. Novak*, No. M2008-02438-COA-R3-CV, 2009 WL 2474714 (Tenn. Ct. App. Aug. 13, 2009). We granted the sellers' Tenn. R. App. P. 11 application for permission to appeal and now find that the Court of Appeals erred by finding that the agreements at issue in this case were contrary to public policy. We have also determined that the evidence fully supports the trial court's decision to dismiss the purchasers' counterclaim for fraudulent inducement.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals
Reversed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, GARY R. WADE, and SHARON G. LEE, JJ., joined.

Stephen C. Knight and Nader Baydoun, Nashville, Tennessee, for the appellants, Wendell P. Baugh, III and Laura W. Baugh.

Paul R. White and Keith Turner, Nashville, Tennessee, for the appellees, Herman Novak and Faith Novak.

# OPINION

## I.

In June 1992, Wendell P. Baugh, III and Laura W. Baugh acquired Precision Services, Inc. from Ronald C. and Gayla J. Miller for $340,000. Precision Services was in the business of aligning large pieces of industrial machinery and printing presses to increase their efficiency. The Millers agreed to finance the transaction. Following the sale, Mr. Baugh managed the day-to-day operations of the company. Ms. Baugh did not play an active role in the business.

Three details of this transaction are relevant to the issues in this case. First, the Baughs personally guaranteed the note executed by the corporation that purchased Precision Services's assets and the right to use its name. Second, Ms. Baugh pledged the stock of the corporation that purchased Precision Services's assets to the Millers as security for the note.[1] Third, the loan agreement contained an explicit limitation on the right of the acquiring corporation to transfer or issue stock.[2] Following the completion of the transaction, the Baughs changed the name of their corporation to Precision Services, Inc.

Herman and Faith Novak were friends and neighbors of the Baughs. Mr. Novak was an electrical engineer who had been employed by General Motors and Alcoa. When Alcoa asked Mr. Novak to move back to Detroit, Mr. Novak talked with Mr. Baugh about finding some business opportunities in Nashville because he and his wife were not eager to move. In May or June 1994, Messrs. Baugh and Novak purchased Penske Plastics, Inc., a manufacturer of polyurethane fiberglass reinforced composite board, for $800,000. Each party owned fifty percent of the company[3] and were, by contractual agreement, jointly and

---

[1]Ms. Baugh was the sole stockholder of the shell corporation that acquired Precision Services's assets and the right to use the name "Precision Services."

[2]Specifically, Section 4.3 of the loan agreement provided:

> LIMITATION ON TRANSFER OF STOCK OF BORROWER OR ISSUANCE OF STOCK. Neither Borrower nor any other person or entity who may now or hereafter own any of the capital stock of Borrower, [may] transfer, pledge or encumber any of the capital stock of Borrower, nor may Borrower issue any new capital stock, nor may any ownership interest in Borrower change in any other way, without obtaining Millers' prior written consent (with a separate consent being required for each such sale, transfer, pledge, encumbrance, or issuance of stock, or any other change of ownership interest), which consent will not be unreasonably withheld.

[3]The stock was placed in their wives' names.

severally liable for the company's debts and obligations. Messrs. Baugh and Novak also agreed to share equally in the profits from the company's operations.

Both Messrs. Baugh and Novak maintained offices at Penske Plastics's plant in Mount Juliet. Following the purchase of Penske Plastics, Mr. Baugh moved the office of Precision Services to the Penske Plastics's plant. Mr. Novak was aware that Mr. Baugh was carrying on Precision Services's and Penske Plastics's businesses at the same time.

In late 1994 or early 1995, Mr. Baugh offered to sell one-half of Precision Services to Mr. Novak because he believed that the company would benefit from Mr. Novak's engineering expertise. Following some negotiations in February or March 1995, Mr. Baugh agreed to sell Mr. Novak a fifty-percent interest in Precision Services, and Mr. Novak agreed to pay Mr. Baugh a purchase price equal to one-half of Precision Services's net annual profit. Because the amount of Precision Services's net annual profit would not be known until later in 1995, they agreed that Mr. Novak would pay Mr. Baugh $50,000 and that he would pay the balance later in the year once the business's net annual profit was calculated. Mr. Novak also agreed to assume one-half of Precision Services's liabilities, including the liability to the Millers.

Because of the limitation on the transfer of Precision Services stock contained in the June 1992 loan agreement with the Millers, Mr. Baugh requested the Millers' permission to sell one-half of the company to Mr. Novak. While the Millers did not refuse permission, they requested detailed information regarding Mr. Novak's personal finances and the terms of the agreement between Messrs. Baugh and Novak. By this time, Mr. Novak was aware of (1) the stock transfer restriction in the June 1992 loan agreement with the Millers, (2) the fact that the Baughs had pledged the Precision Services stock as security for the Millers' loan, and (3) the Millers' request for additional information regarding his personal finances and the terms of the agreement between Messrs. Baugh and Novak regarding Precision Services.

Because Mr. Baugh had found the Millers difficult to deal with in the past, he requested his attorney to structure a transaction that would enable Mr. Novak to acquire a one-half interest in Precision Services without the Millers' approval. Mr. Baugh's attorney drafted documents, including a stock purchase agreement, to enable Mr. Novak to acquire a right to one-half of the stock of Precision Services without the Millers' approval. These documents also contained an indemnity agreement in which the Novaks agreed to indemnify and hold the Baughs harmless for fifty percent of any payments they were required to make on the Millers' note and Precision Services's other debts.

On March 5, 1995, Mr. Novak gave Mr. Baugh a check for $25,000 containing the notation "½ of cash for 50% of Precision Serv., Inc." In late April 1995, the Baughs and the Novaks met in the office of Mr. Baugh's attorney and signed the stock purchase agreement

and indemnity agreement.[4]  On April 26, 1995, Mr. Novak gave Mr. Baugh a second check for $25,000 containing the notation "Final Payment for Half Ownership of Precision Services."  Shortly after the completion of the transaction in April 1995, Mr. Novak requested the Baughs to provide him with an indemnity agreement regarding Precision Services's obligations similar to the one that the Novaks had provided to the Baughs.  Mr. Baugh obliged by providing an agreement indemnifying the Novaks that was substantially identical to the agreement that the Novaks had provided the Baughs.

On September 29, 1995, following the end of Precision Services's fiscal year and the calculation of the company's net profits, Mr. Novak gave Mr. Baugh a check for $17,000 marked "50% of Precision Paid in Full."  Precision Services's federal tax returns from 1995 through 2003 stated that both Messrs. Baugh and Novak owned fifty percent of the company.  Messrs. Baugh and Novak were joint borrowers on loans to Precision Services from the Bank of Nashville and First State Bank.  As late as October 2004, Mr. Novak prepared "financial summaries" valuing his interest in Precision Services at $125,000.

From 1995 through June 2005, Messrs. Baugh and Novak managed and operated both Penske Plastics and Precision Services.  Penske Plastics's business grew and flourished; however, Precision Services's business did not.  In 1999 or 2000, Precision Services lost one of it largest customers, accounting for sixty to seventy percent of its annual revenue.  In Mr. Baugh's words, Precision Services's business "just kind of slowly died" because the industry changed and its "services were no longer in demand."  Penske Plastics became the "golden egg" for Precision Services because revenues generated by Penske Plastics were frequently and regularly used to pay the obligations of Precision Services.

The Penske Plastics plant sustained significant damage by fire on June 2, 2003.  One piece of equipment was heavily damaged and the building was filled with acidic smoke and soot.  The soot damaged the remaining equipment and infiltrated into the offices.  Many of the papers that Mr. Baugh kept in open banker's boxes in his office were so damaged that they were discarded.  Among these papers were the original signed copies of the documents

---

[4]The Novaks asserted in the lower courts that they never signed these documents and that they declined to finalize the transaction.  Mr. Novak stated he was "uncomfortable" because of the problems with the Millers and because one-half of the Precision Services stock would not be immediately transferred to him and his wife.  The trial court found as a fact that the Baughs and the Novaks executed these documents in April 1995.  In their brief filed in this Court, the Novaks have not formally challenged the evidentiary foundation for the trial court's findings of fact, even though they continue to claim in their statement of facts that they did not execute the documents.  In the absence of compelling reasons, this Court does not consider issues that have not been presented by the parties for review.  Tenn. R. App. P. 13(b).  Accordingly, we decline to consider whether the evidence preponderates against the trial court's findings that the Novaks executed the documents.  For the purpose of this decision, we accept the finding of the trial court that both the Novaks and the Baughs executed these documents.

the Baughs and the Novaks had executed in April 1995. The companies' insurance policies were not sufficient to cover all the damage caused by the fire.

In mid-2005, Messrs. Baugh and Novak sold Penske Plastics to Alcan Baltec. The new owner did not require Mr. Baugh's services, and so Mr. Baugh physically left the premises in June 2005 to pursue a new career as a commercial real estate broker. Mr. Novak remained with Penske Plastics. Up until the time of the closing of the sale of Penske Plastics, the loan obligations of Precision Services continued to be paid using revenue from Penske Plastics.

By mid-December 2005, the financial status of Precision Services was precarious. In an email to Mr. Novak dated December 13, 2005, Mr. Baugh suggested ways "to limit our losses" and professed that he did "not understand your attitude towards [P]recision Services[.] [Y]ou seem to believe that it doesn't exist and that you have no liability for the Miller debt." Mr. Novak responded by email on December 15, 2005. He agreed with Mr. Baugh's cost saving suggestions and asked Mr. Baugh to provide him with "copies of the indemnification agreement along with any other Precision Services documents that you have . . . in preparation for our future discussions." Mr. Novak also wished the Baughs a Merry Christmas.

On December 22, 2005, Mr. Novak sent Mr. Baugh a handwritten note essentially washing his hands of Precision Services. The note stated that "[m]y employment agreement with Penske does not allow me to work on anything but Penske." When Mr. Baugh received this note, he decided that he "got everything dumped in his lap." In January 2006, Mr. Baugh began paying Precision Services's 1992 note to the Millers and its 2002 First State Bank loan out of his own pocket. In mid-April 2006, Mr. Baugh paid off the First State Bank loan, and the bank assigned its interest in the note to Mr. Baugh.

On June 19, 2006, the Baughs filed suit against the Novaks in the Chancery Court for Williamson County. They sought enforcement of the 1995 indemnity agreement with regard to the obligations of Precision Services to the Millers and First State Bank. The Novaks denied that they were legally required to indemnify the Baughs for these obligations. Following a bench trial on July 16 and 17, 2008, the trial court filed a memorandum opinion on September 30, 2008, finding that the original stock purchase and indemnity agreements signed by the Baughs and the Novaks were destroyed in the 2003 fire. The court also determined that the Novaks were liable to the Baughs under the indemnity agreement for fifty percent of the Millers' note and that the Novaks had not been induced to enter into the indemnity agreement by fraudulent representations on Mr. Baugh's part. Accordingly, on October 3, 2008, the trial court entered a final judgment awarding the Baughs a $201,715.50 judgment against the Novaks.

The Novaks appealed to the Court of Appeals. They asserted that the trial court had erred in several of its evidentiary rulings and that the court had erred by refusing to apply the Statute of Frauds and by failing to find that Mr. Baugh had fraudulently induced Mr. Novak to purchase the stock of Precision Services. The Court of Appeals filed its opinion on August 13, 2009. *Baugh v. Novak*, No. M2008-02438-COA-R3-CV, 2009 WL 2474714 (Tenn. Ct. App. Aug. 13, 2009).

The majority of the panel concurred with the trial court's decisions that the indemnity agreement had existed and was not rendered unenforceable by the Statute of Frauds. *Baugh v. Novak*, 2009 WL 2474714, at *5, *8. However, on its own motion, the majority of the panel reversed the trial court's judgment on the ground that the 1995 indemnification agreement between the Baughs and the Novaks was "unenforceable on public policy grounds" because it undermined the purpose of Tenn. Code Ann. § 48-16-208 (2002). *Baugh v. Novak*, 2009 WL 2472414, at *6-8. Based on its conclusion that the indemnity agreement was unenforceable, the majority did not address the Novaks' issues with regard to their fraudulent inducement claim. *Baugh v. Novak*, 2009 WL 2474714, at *8.

In a dissenting opinion, the remaining member of the panel stated that he would affirm the trial court's judgment. While the dissenting judge believed that "the Novaks were *bona fide* purchasers without knowledge of the [stock transfer] restriction," he concluded that the enforcement of the stock transfer restrictions authorized by Tenn. Code Ann. § 48-16-208 was normally left to the corporation or other stockholders. *Baugh v. Novak*, 2009 WL 2474714, at *9 (Highers, P.J., W.S., dissenting).

We granted the Baughs' application for permission to appeal to address the conclusion of the Court of Appeals that the 1995 indemnity agreement was unenforceable because it was drafted to circumvent the stock transfer restrictions in the 1992 loan agreement with the Millers. The Novaks, conceding that they had never asserted that the 1995 indemnity agreement was unenforceable on public policy grounds, assert that the majority of the Court of Appeals panel properly invalided the agreement on public policy grounds and renew their assertion that the Baughs fraudulently induced them to purchase the Precision Services stock.

On July 22, 2010, after this Court granted their Tenn. R. App. P. 11 application for permission to appeal, the Baughs filed a voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Middle District of Tennessee. The Baughs did not notify this Court that they had filed the petition. After discovering that the bankruptcy proceeding was pending, this Court directed the parties to address the effect of the automatic stay provisions of 11 U.S.C. 362(a) on our ability to decide this appeal.

The Novaks filed a response requesting this Court to consider as post-judgment facts under Tenn. R. App. P. 14 certain papers filed in the bankruptcy proceeding, as well as

papers filed in the Circuit Court for Maury County relating to litigation between the Millers and the Baughs. The Novaks also asserted new arguments regarding their dispute with the Baughs based on these records. In their response, the Baughs informed the Court that the bankruptcy court had entered an order on May 10, 2011 granting relief from the automatic stay "so as to permit the [Tennessee] Supreme Court to address issues related to and render an opinion in [this case]." Based on the parties' post-argument filings, we have decided that it is appropriate to consider as post-judgment facts (1) that on July 22, 2010, the Baughs filed a voluntary Chapter 11 bankruptcy petition in the United States District Court for the Middle District of Tennessee and (2) that on May 10, 2011, the bankruptcy court entered an order granting relief from the automatic stay to enable this Court to decide this case.[5]

## II.

At the outset, we note that the Court of Appeals decided this case based on its conclusion that the contract between the Baughs and the Novaks was contrary to public policy. That issue had not been asserted in the pleadings and had not been raised in the trial court. Neither had it been briefed or argued before the Court of Appeals.

As a general matter, the issues addressed by the appellate courts should be limited to those that have been raised and litigated in the lower courts, *see Pugh's Lawn Landscape Co. v. Jaycon Dev. Corp.*, 320 S.W.3d 252, 260 (Tenn. 2010); *Powell v. Cmty. Health Sys., Inc.*, 312 S.W.3d 496, 511 (Tenn. 2010), and which have been fully briefed and argued in the appellate courts. *See State ex rel. D'Amore v. Melton*, 186 Tenn. 548, 550, 212 S.W.2d 375, 376 (1948); *State v. Northern*, 262 S.W.3d 741, 766 (Tenn. 2008) (Holder, J., concurring and dissenting). However, Tenn. R. App. P. 13(b) recognizes that exceptions can be made in appropriate circumstances.

---

[5]In light of the statements and representations contained in the papers the Baughs have filed in their bankruptcy proceeding, the Novaks also insist that the Baughs should be judicially estopped from taking legal positions in this proceeding that are inconsistent with those they are currently taking in the bankruptcy proceeding and that this Court should somehow protect the Novaks from potential liability to both the Baughs and the Millers. Our jurisdiction is appellate only. *Duncan v. Duncan*, 672 S.W.2d 765, 767 (Tenn. 1984) (citing Tenn. Const. art. VI, § 2); Tenn. Code Ann. § 16-3-201(a) (2009). Accordingly, parties before this Court are generally not permitted to raise issues that were not presented to the lower courts. *City of Cookeville ex rel. Cookeville Reg'l Med. Ctr. v. Humphrey*, 126 S.W.3d 897, 905-06 (Tenn. 2004); *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991). The substantive arguments that the Novaks are now making were not presented to the lower courts and do not involve issues that must necessarily be addressed in order to decide whether the Court of Appeals erred by invalidating the contracts between the Baughs and the Novaks on the ground that they were contrary to public policy. Accordingly, we decline to address the issues relating to the alleged inconsistencies between the Baughs' legal positions in this proceeding and in the bankruptcy proceeding or the issues relating to the Novaks' potential liability to the Millers. Nothing in this opinion should be construed to prevent the Novaks from presenting these or any other issues to the bankruptcy court.

A challenge to the validity of a contract based on public policy grounds is one such exception. One authoritative text has recognized that the issue of whether a contract is contrary to public policy is an issue that trial and appellate courts may raise sua sponte. 15 Grace McLane Giesel, *Corbin on Contracts* § 79.6, at 27, 32 (rev. ed 2003) (*"Corbin on Contracts"*); *see also* Restatement (Second) of Contracts, ch. 8, topic 1, at 5 (1981). We have also previously reached the same conclusion. *Reaves Lumber Co. v. Cain-Hurley Lumber Co.*, 152 Tenn. 339, 344, 279 S.W. 257, 258 (1925) (quoting *Cary-Lombard Lumber Co. v. Thomas*, 92 Tenn. 587, 594, 22 S.W. 743, 745 (1893) (holding that "[t]he courts will deny any relief upon any illegal contract . . . whenever the illegality is made to appear")).

We take no issue with the intermediate appellate court's decision to address on its own motion whether the contract between the Baughs and the Novaks was contrary to public policy. However, it would have been better practice for the court to give the parties an opportunity to address this issue before the filing of the opinion.[6] Particularly in cases involving the enforceability of contracts on public policy grounds, fairness dictates providing the parties notice that the court intends to consider the issue and a reasonable opportunity to address the issue before the court decides it. 15 *Corbin on Contracts* § 79.6, at 35. The parties have addressed this issue in the briefs filed in this Court and during oral argument. Accordingly, the issue is now properly before us.

The determination of whether a contract is unenforceable on public policy grounds is a question of law. *Mascari v. Raines*, 220 Tenn. 234, 241, 415 S.W.2d 874, 877 (1967); *Vintage Health Res., Inc. v. Guiangan*, 309 S.W.3d 448, 464 (Tenn. Ct. App. 2009). We review rulings on questions of law de novo with no presumption of correctness. *Graham v. Caples*, 325 S.W.3d 578, 581 (Tenn. 2010); *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 836 (Tenn. 2008). Despite the possible limitations in the appellate record stemming from the fact that this issue was not raised in the trial court, we have determined that the record contains sufficient facts to address this essentially legal issue.

### III.

The Baughs take issue on this appeal with the decision of the Court of Appeals that their contract with the Novaks was unenforceable because it was contrary to Tenn. Code Ann. § 48-16-208. They insist (1) that Tenn. Code Ann. § 48-16-208 does not apply to the

---

[6]The Court of Appeals filed its opinion invalidating the stock purchase and indemnity agreements on the ground that they were contrary to public policy without first giving the parties an opportunity to brief the issue. It also denied the Baughs' Tenn. R. App. P. 39 petition for rehearing in which the Baughs argued that challenging a contract on the grounds that it is contrary to public policy is an affirmative defense under Tenn. R. Civ. P. 8.03 and stating that the intermediate appellate court had "reached several understandable but inaccurate conclusions."

stock transfer restriction in their loan agreement with the Millers and (2) that their contracts with the Novaks are not contrary to clear public policy. The Novaks respond that contracts that are contrary to Tenn. Code Ann. § 48-16-208 and that "involve the breach of another contract" are unenforceable on public policy grounds. We have determined that the Baughs have the better argument.

**A.**

The authority "of the courts to invalidate the bargains of parties on grounds of public policy is unquestioned and is clearly necessary." 5 Samuel Williston, *Treatise on the Law of Contracts* § 12:3, at 858 (Richard A. Lord ed., 4th ed. 2009) ("Williston") (footnote omitted); *see also Mattox v. Loretto Fin. Servs.*, No. 01A01-9307-CV-00308, 1994 WL 698046, at *5 (Tenn. Ct. App. Dec. 14, 1994) (No Tenn. R. App. P. 11 application filed). Tennessee courts have long recognized and exercised this authority. *See, e.g., McWhirter v. Douglas*, 41 Tenn. (1 Cold.) 591, 605-06 (1860); *Ohio Life Ins. & Trust Co. v. Merchs.' Ins. & Trust Co.*, 30 Tenn. (11 Hum.) 1, 10-11 (1850); *Hale v. Henderson*, 23 Tenn. (4 Hum.)199, 200 (1843).

However, exercising this largely undefined authority requires courts to act with great delicacy. *White v. McMath & Johnston*, 127 Tenn. 713, 718, 156 S.W. 470, 471 (1913); *see also Mays v. Sovereign Camp, W. O. W.*, 151 Tenn. 604, 608, 271 S.W. 34, 35 (1925) (quoting *Hartford Fire Ins. Co. v. Chi., Milwaukee & Saint Paul Ry. Co.*, 175 U.S. 91, 102 (1899)); *Stansell v. Roach*, 147 Tenn. 183, 190, 246 S.W. 520, 522 (1923). The need for delicacy arises because exercising the authority "to declare contracts as void as against public policy is in tension with freedom of contract and the need to bind parties to their voluntary agreements." 21 Steven W. Feldman, *Tennessee Practice: Contract Law and Practice* § 7:3, at 732 (2006) ("Feldman").

Tennessee law recognizes that "[t]he individual right of freedom of contract is a vital aspect of personal liberty." 21 Feldman § 7:1, at 728. Accordingly, this Court has cautioned that

> [i]t must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because, if there is one thing which more than another public policy requires, it is that [persons] of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice. Therefore you have this paramount public policy to consider; that you are not lightly to interfere with this freedom of contract.

*McKay v. Louisville & N. R.R. Co.*, 133 Tenn. 590, 599-600, 182 S.W. 874, 876 (1916) (quoting *Balt. & Ohio Sw. Ry. v. Voight*, 176 U. S. 498, 505-06 (1900)).

The principle of freedom of contract is "rooted in the notion that it is in the public interest to recognize that individuals have broad powers to order their own affairs by making legally enforceable promises." Restatement (Second) of Contracts, ch. 8, intro. note, at 2-3 (1981); *see also* John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 1.4, at 6-7 (4th ed. 1998). This form of private autonomy, "premised on the ability of individuals to order their own affairs, and the desirability of allowing them to do so," stands at the foundation of contract law. Bruce J. Winick, *On Autonomy: Legal and Psychological Perspectives*, 37 Vill. L. Rev. 1705, 1753-54 (1992) ("Winick"). In a market economy, "economic decisionmaking, at least at the microeconomic level, is left substantially to the individual . . . . [T]he individual is substantially free to order his or her economic affairs as he or she chooses." Winick, 37 Vill. L. Rev. at 1754.

Drawing upon this understanding, this Court has often "held that public policy is best served by freedom of contract . . . ." *Chazen v. Trailmobile, Inc.*, 215 Tenn. 87, 91, 384 S.W.2d 1, 3 (1964). Tennessee, both in its statutory and case law, "recognize[s] a strong public policy of individual autonomy, i.e. freedom of contract, as courts allow parties to strike their own bargains, absent a supervening legal reason to restrict that economic liberty." 21 Feldman § 1:6, at 17. The course of development of "[c]ontract law in Tennessee plainly reflects the public policy allowing competent parties to strike their own bargains." *Ellis v. Pauline S. Sprouse Residuary Trust*, 280 S.W.3d 806, 814 (Tenn. 2009).

Nevertheless, while noting that "[t]he right of contract is confessedly an inherent part of both the right of 'liberty' and the right of 'property,'" we have also concluded that this right is not absolute. *State ex rel. Astor v. Schlitz Brewing Co.*, 104 Tenn. 715, 746, 59 S.W. 1033, 1040 (1900); *see also Harbison v. Knoxville Iron Co.*, 103 Tenn. 421, 430-31, 53 S.W. 955, 957 (1899). The freedom of contract must give way to the preservation of the public health, safety, morals, or general welfare. *State v. Greeson*, 174 Tenn. 178, 186, 124 S.W.2d 253, 256 (1939); *see also State v. Nuss*, 114 N.W.2d 633, 635 (S.D. 1962). Thus, although freedom of contract is of vital importance, it is not an absolute right unbounded or without limits. 21 Feldman §7:1, at 728-29. Among the limitations on the freedom to contract is that individuals can contract "as they see fit so long as such a contract is not against public policy." *Third Nat'l Bank in Nashville v. Olive*, 198 Tenn. 687, 693, 281 S.W.2d 675, 678 (1955); *see also Wilson v. Tenn. Farmers Mut. Ins. Co.*, 219 Tenn. 560, 566, 411 S.W.2d 699, 702 (1966).

For many years, Tennessee's courts have applied the same analysis for determining whether a contract should be found unenforceable on public policy grounds. Exercising appropriate judicial restraint, the courts will decline to enforce a contract on public policy

grounds only (1) when the violation of public policy is clearly established,[7] (2) when the violation is inherent in the contract itself, not collateral thereto,[8] or when the contract's purpose taints it with illegality,[9] and (3) when a clear public detriment will probably occur as a result of the contract or where the object of the contract tends to injure the public.[10] The courts should be even more circumspect about declining to enforce a contract on public policy grounds when the party seeking to invalidate the contract has received the benefit of the other party's performance. *Vintage Health Res., Inc. v. Guiangan*, 309 S.W.3d at 465; *see also* 21 Feldman § 7.6, at 737-38.

In circumstances where public policy imposes limitations on the freedom of contract, Tennessee's courts are well-advised to wield a scalpel rather than a sledgehammer. We must, if possible, interpret contracts in a way that upholds their validity. *Carolina Spruce Co. v. Black Mountain Ry.*, 139 Tenn. 137, 157, 201 S.W. 154, 159 (1918). Likewise, when the provisions of a contract are legally severable, we must give effect to portions of the contract that may be enforced and invalidate only those portions of the contract that are

---

[7] *See Home Beneficial Ass'n v. White*, 180 Tenn. 585, 589, 177 S.W.2d 545, 546 (1944) (quoting *Twin City Pipe Line Co. v. Harding Glass Co.*, 283 U.S. 353, 356-57 (1931) (stating that "[t]he principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which that doctrine rests")); *Stansell v. Roach*, 147 Tenn. at 190, 246 S.W. at 522 (indicating that "[c]ourts will not declare contracts void on grounds of public policy except in cases free from doubt; a prejudice to the public interest must clearly appear before a court is justified in pronouncing a contract void on that account"); *White v. McMath & Johnston*, 127 Tenn. at 718, 156 S.W. at 471 (stating that "[t]he power to declare contracts void as against public policy is . . . only to be exercised in cases settled by recognized precedents and when free from doubt"); *see also Evans v. Sheriden*, 28 Tenn. App. 90, 100, 186 S.W.2d 911, 914 (1944) (asserting that "[a] contract should not be declared void as against public policy except in cases free from doubt and a prejudice to the public interest must clearly appear").

[8] *McCallum v. McIsaac*, 159 Tenn. 655, 658, 21 S.W.2d 392, 393 (1929) (indicating that "[t]o invalidate a contract for illegality, the illegality must be inherent, not merely collateral"); *Vintage Health Res., Inc. v. Guiangan*, 309 S.W.3d at 466 (declaring that "Tennessee law is clear that, for a contract to be deemed unenforceable as violative of public policy, 'the illegality must be inherent, not merely collateral'").

[9] *See Vintage Health Res., Inc. v. Guiangan*, 309 S.W.3d at 465 (stating that "[i]f the purpose underlying the agreement contravenes public policy, it will be deemed unenforceable"); *Freeman v. Thompson*, 600 S.W.2d 234, 236 (Tenn. Ct. App. 1979) (invalidating a contract as against public policy where the "agreement was tainted with illegality and is part of the overall scheme to get around the anti-rebate statutes of the State of Tennessee"); *cf. Hoyt v. Hoyt*, 213 Tenn. 117, 127, 372 S.W.2d 300, 304 (1963) (observing that "[t]he purpose of a contract is important in the consideration of whether or not it violates public policy").

[10] *See Lazenby v. Universal Underwriters Ins. Co.*, 214 Tenn. 639, 648, 383 S.W.2d 1, 5 (1964); *Home Beneficial Ass'n v. White* 180 Tenn. at 588-89, 177 S.W.2d at 546; *Holt v. Holt*, 751 S.W.2d 426, 428 (Tenn. Ct. App. 1988).

unenforceable. *Biggs v. Reliance Life Ins. Co.*, 137 Tenn. 598, 607, 195 S.W. 174, 176-77 (1917); *see also* 21 Feldman §7:6, at 737-38; 5 Williston § 12:3, at 885-86, 888, 892.

**B.**

The meaning and scope of the phrase "public policy" in the context of determining whether a contract is unenforceable because it is contrary to public policy has been described as "vague and variable." *Hoyt v. Hoyt*, 213 Tenn. at 124, 372 S.W.2d at 303 (quoting *Home Beneficial Ass'n v. White*, 180 Tenn. at 589, 177 S.W.2d at 546). It is necessarily so because public policy ebbs and flows with the community's ever-changing needs. *See* Percy H. Winfield, *Public Policy in English Common Law*, 42 Harv. L. Rev. 76, 92-96 (1928). To assess Tennessee's public policy, the courts look to the Constitution of Tennessee, the statutes enacted by the General Assembly, the common law, and prior court decisions. *Crawford v. Buckner*, 839 S.W.2d 754, 759 (Tenn. 1992); *Smith v. Gore*, 728 S.W.2d 738, 747 (Tenn. 1987); *State ex rel. Swann v. Pack*, 527 S.W.2d 99, 112 n.17 (Tenn. 1975).

In this case, the Court of Appeals based its conclusion that the contract between the Baughs and the Novaks was unenforceable because it was nothing more than the Baughs' attempt to circumvent the stock transfer restrictions contained in the 1992 contract between the Millers and the Baughs. These restrictions, at least according to the Novaks, were authorized by Tenn. Code Ann. § 48-16-208. Thus, the Court of Appeals's decision rests on its conclusion that the 1995 contracts between the Baughs and the Novaks are unenforceable because they are inconsistent with Tenn. Code Ann. § 48-16-208 and because entering into these agreements amounted to a breach of an entirely separate contract.

Tennessee courts have long recognized that, as a general rule, a contract explicitly prohibited by statute is unenforceable. *Biggs v. Reliance Life Ins. Co.*, 137 Tenn. at 604, 195 S.W. at 176. In determining if a statute renders a contract unenforceable as against public policy, the clearest case of unenforceability arises when "the statute specifically condemns a contract (or a term thereof) as illegal or void" or where "the legislature . . . expressly disentitle[s] the offending party to any civil remedy on the improper transaction." 21 Feldman § 7:15, at 762.[11] Because Tenn. Code Ann. § 48-16-208 does not contain language

_____

[11]The General Assembly has enacted numerous statutes of this type. *See, e.g.*, Tenn. Code Ann. § 29-19-101 (2000) ("All contracts founded, in whole or in part, on a gambling or wagering consideration, shall be void to the extent of such consideration."); Tenn. Code Ann. § 40-11-311(a) (2006) ("Any contract . . . entered into between a professional bondsman and any other person or persons, wherein the bondsman charges . . . in consideration of the bondsman's performance of . . . any of the acts or things declared to be unlawful by §§ 40-11-307 – 40-11-310, are declared to be against public policy, illegal and void."); Tenn. Code Ann. § 47-25-1006 (2001) ("Any cooperative may contract with its members to waive liability for the loss of or damage to works of art consigned to such cooperative. Any other provision of a contract or an

(continued...)

to this effect, we must look elsewhere to find a basis upon which to invalidate the contract between the Baughs and the Novaks.

A statute may still provide the basis for finding a contract unenforceable even if it does not specifically invalidate the contract or deprive the contracting parties of their right to pursue remedies if the contract is breached. *See* 8 Williston § 19:44, at 527. In this circumstance, however, the statute should not be read as inflexibly invalidating on grounds of public policy all contracts that contradict it. *Biggs v. Reliance Life Ins. Co.*, 137 Tenn. at 604, 195 S.W. at 176; *see also* 21 Feldman § 7:16, at 764. To the contrary, the courts' inquiry must extend beyond the statute, and the courts should proceed cautiously because deciding whether a contract is so offensive to public policy that it should not be enforced is an "inexact science." 15 *Corbin on Contracts* § 79:3, at 18.

In circumstances in which the statute does not specifically invalidate a contract, the courts' task is to ascertain, by examining all relevant indicia of legislative intent, whether the General Assembly intended to invalidate all contracts that are contrary to the statute. *Biggs v. Reliance Life Ins. Co.*, 137 Tenn. at 604, 195 S.W. at 176; 21 Feldman § 7:16, at 764. This Court has noted that

> [i]n arriving at the effect of the statute . . . on the validity of the . . . contract, there is open for consideration the objects and reach of the statute, its subject-matter, the mischiefs aimed to be corrected, the class of persons sought to be controlled, and whether the legislative intention will be subserved by holding the policy contract valid or invalid.

---

[11](...continued)
agreement whereby the consignor purports to waive any provision of this part is void."); Tenn. Code Ann. § 47-25-1213 (2001) ("Any waiver by the customer of the provisions of this part is deemed contrary to public policy and is void and unenforceable."); Tenn. Code Ann. § 47-25-1313(a) (2001) ("The provisions of this part shall not be waivable in any contract, and any such attempted waiver shall be null and void."); Tenn. Code Ann.§ 49-7-2133(b) (2009) ("A student athlete may not under any circumstances effect a waiver of the right to cancel, and any attempted waiver of the right to cancel shall be ineffective."); Tenn. Code Ann. § 62-13-105 (2009) ("No action or suit shall be instituted, nor recovery be had by any person, in any court of this state for compensation for any act done or service rendered, the doing or rendering of which is prohibited under this chapter to other than by licensed brokers, affiliate brokers or time-share salespersons . . . ."); Tenn. Code Ann. § 66-4-202 (2004) ("Any such agreement . . . shall be utterly void where the seller has not . . . been in actual possession of the lands or tenements, or of the reversion or remainder, or taken the rents or profits for one (1) whole year next before the sale."); Tenn. Code Ann. § 66-34-701 (2004) ("[C]ompliance with §§ 66-34-205, 66-34-304, and 66-34-602 may not be waived by contract and these sections are applicable to all private contracts and all construction contracts with this state, . . . all counties and municipalities and all departments, . . . and any other subdivision of the state.").

*Biggs v. Reliance Life Ins. Co.*, 137 Tenn. at 603, 195 S.W. at 175-76; *see also* 21 Feldman § 7:16, at 764 (stating that "[i]n assessing the legislative purpose, the court must consider the reach and object of the statute, its subject matter, the evils aimed to be corrected, the class of persons sought to be controlled, and whether the intent will be advanced or frustrated by holding the contract void").

If, after analyzing all these factors, the court finds that the General Assembly clearly intended to invalidate contracts contrary to the statute, it should decline to enforce the contract because it is contrary to public policy. If, however, the court concludes that the General Assembly's intent to render contradictory contracts unenforceable is not manifest or clear, the court should refrain from invalidating the contract on public policy grounds. In this circumstance, uncertainty regarding the General Assembly's intent militates against finding the contract unenforceable as against public policy. *See Mascari v. Raines,* 220 Tenn. at 239, 415 S.W.2d at 876; *Home Beneficial Ass'n v. White*, 180 Tenn. at 589, 177 S.W.2d at 546; *Stansell v. Roach*, 147 Tenn. at 190, 246 S.W. at 522; *White v. McMath & Johnston*, 127 Tenn. at 718, 156 S.W. at 471; *McWhirter v. Douglas*, 41 Tenn. (1 Cold.) at 606; *see also Evans v. Sheriden*, 28 Tenn. App. at 100, 186 S.W.2d at 914-15.

## C.

For nearly a decade, the Novaks enjoyed the benefits of being half-owners of Precision Services. They received financial renumeration from the company, and Mr. Novak shared control in the operation and management of the business. Now, after the company's financial fortunes have reversed, the Novaks are seeking to avoid the financial burdens attendant with the indemnification agreement that was part of their acquisition of this ownership interest. Before delving more deeply into our analysis, we reiterate that Tennessee courts should be particularly hesitant to decline to enforce an otherwise valid contract when the party seeking to avoid its contractual obligations has already received the benefit of the other party's performance. *See Vintage Health Res., Inc. v. Guiangan*, 309 S.W.3d at 465.

## D.

We find that the Court of Appeals erred by determining that the contract between the Baughs and the Novaks was unenforceable on the ground that it violated Tennessee's public policy. We base this decision on four conclusions.

First, based on the facts and circumstances of this case, it does not appear that either the public, the Millers, or the Novaks were or will be harmed by any violation of Tenn. Code Ann. § 48-16-208 in the Novaks' 1995 stock purchase agreement or by other similar

-14-

contracts. The Novaks were not uninformed buyers. To the contrary, they were aware of the possible limitations on the Baughs' ability to transfer the shares of Precision Services.[12]

There is simply no evidence in this case that either the Novaks or the Millers were harmed by the 1995 stock purchase agreement. The trial court found that "the Novaks received all of the benefits that they would have received if the Millers had approved the sale." By the same token, the 1995 stock purchase agreement and accompanying indemnification agreements did not harm the Millers. It did not prevent the Millers from proceeding directly against the Baughs to recover damages resulting from the Baughs' breach of the 1992 loan agreement. If anything, the Millers benefitted from the indemnification agreements because they provided additional parties who would be secondarily liable to the Millers if the Baughs breached the 1992 loan agreement.[13]

Second, it is not clear that the 1995 stock purchase between the Baughs and the Novaks violated Tenn. Code Ann. § 48-16-208. Tenn. Code Ann. § 48-16-208(b) authorizes restrictions on the transfer or registration of transfer of shares of stock and also permits these restrictions to be enforced against the holder of the stock and the transferee of the holder unless the individual lacks knowledge of the restriction. Even though the Baughs and the Novaks operated Precision Services as joint owners, the evidence does not clearly indicate that the Baughs actually transferred any of Precision Services's stock to the Novaks. With the facts in this posture, any potential violation of Tenn. Code Ann. § 48-16-208 is far from clear.[14]

Third, it is not sufficiently clear to this Court that the General Assembly intended to invalidate all contracts similar to the 1995 stock purchase agreement or the related agreements between the Baughs and the Novaks that might be contrary to Tenn. Code Ann.

---

[12]Mr. Novak testified that he knew about the restrictions on the transferability of the Precision Services stock based on the Millers' reservation of their right to assent to the Baughs' transfer of any ownership interest in Precision Services. He claimed that this knowledge led him to decline to finalize the stock purchase agreement with the Baughs. The trial court found that Mr. Novak's testimony that he and his wife did not complete the stock purchase agreement to be unconvincing. However, the trial court did not question the veracity of Mr. Novak's testimony that he knew that the Millers had reserved their right to approve any transfer of ownership interest in Precision Services.

[13]If Tenn. Code Ann. § 48-16-208 applies to the 1992 loan agreement between the Baughs and the Millers, the transfer restriction remains applicable against both the holder of the stock and the transferee of the holder. Tenn. Code Ann. § 48-16-208(b).

[14]Our decision in this case does not require us to decide whether the 1995 stock purchase agreement between the Baughs and the Novaks ran afoul of Tenn. Code Ann. § 48-16-208.

§ 48-16-208.[15] Stopping short of finding that all contracts such as the 1995 stock purchase agreement are unenforceable will not undermine the purpose of Tenn. Code Ann. § 48-16-208 because (1) the lender will still be able to seek damages for breach of the restriction, (2) the lender will still be able to enforce the transfer restrictions against the holder of the stock and the transferee, and (3) the borrower will continue to be liable to the lender for breach of the loan agreement.

Fourth, even if we were to assume that the 1995 stock transfer agreement was contrary to Tenn. Code Ann. § 48-16-208 and that the Baughs actually transferred one-half of their Precision Services stock to the Novaks, invalidating both the stock transfer agreement and the indemnity agreements would be a broader remedy than necessary to vindicate the purpose of Tenn. Code Ann. § 48-16-208. The trial court found that

> the Novaks received all of the benefits that they would have received if the Millers had approved the sale . . . . Precision is now out of business, and its stock has no value. The Millers' failure to approve the sale has therefore had no effect on the consideration received by the Novaks.

In light of this uncontested finding, there is no need to invalidate the indemnity agreements between the Baughs and the Novaks in order to vindicate Tenn. Code Ann. § 48-16-208. The issues surrounding the actual transfer of the Precision Services stock can easily and appropriately be severed from the issues relating to the enforceability of the indemnity agreements.

## IV.

For their part, the Novaks insist that the trial court erred by finding that they failed to prove their claim that the Baughs fraudulently induced them to purchase the Precision Services stock and that the trial court should have awarded them $73,000 on their counterclaim. The Baughs respond that the trial court properly rejected the Novaks' fraudulent inducement counterclaim. We again find merit in the Baughs' arguments.

To be successful, a party making a fraudulent inducement claim has the burden of proving that the defendant (1) made a false statement concerning a fact material to the transaction (2) with knowledge of the statement's falsity or utter disregard for its truth (3) with the intent of inducing reliance on the statement, (4) the statement was reasonably relied

---

[15]The contract in this case involves a buyer and seller of stock who were aware of the restriction upon the transfer of the stock and transfer restriction that was tied solely to interest of third party to secure the payment of a loan.

upon, and (5) an injury resulted from this reliance. *See Lamb v. MegaFlight, Inc.*, 26 S.W.3d 627, 630-31 (Tenn. Ct. App. 2000); *see also* 21 Feldman § 6:21, at 521-22; 27 Joseph T. Getz & Michael I. Less, *Tennessee Practice: Construction Law Handbook* § 1:15, at 17 (2010). Even though the Novaks argue that they met their burden of proof, we have concluded that they have not established either that they reasonably relied on any statement attributable to the Baughs that they had authority to transfer the Precision Services stock or that they were actually harmed by any such representations that the Baughs made.

The trial court found that the Novaks entered into the transaction with the Baughs with their "eyes open" and that the Novaks were aware of the stock transfer restrictions in the 1992 loan agreement between the Millers and the Baughs. Having reviewed this finding in accordance with Tenn. R. App. P. 13(d), we have no basis to conclude that the preponderance of the evidence is contrary to these conclusions.

The trial court also found that "[t]he limitation on transfer of stock language in the Miller Loan Agreement had no effect on the Novaks." In this regard, the trial court concluded that

> the Novaks received all of the benefits that they would have received if the Millers had approved the sale. Herman Novak received half of Precision's profits while the company was profitable, and he received equivalent benefits to those enjoyed by Precision's other owner. Precision is now out of business, and its stock has no value. The Millers' failure to approve the sale has therefore had no effect on the consideration received by the Novaks.

Because the evidence does not preponderate against these findings, we decline to find that the Novaks suffered an injury as a result of their reliance upon any false statements made by the Baughs with regard to their authority to transfer the stock to the Novaks. Accordingly, we have concluded that the trial court did not err by concluding that the Novaks failed to establish that the Baughs fraudulently induced them to contract to purchase a fifty-percent share of the ownership interest in Precision Services.

## V.

We, therefore, find that the Court of Appeals erred by reversing the trial court's order granting a $201,715.50 judgment in favor of the Baughs based on their breach of contract claim against the Novaks. We also find that the trial court did not err by rejecting the Novaks' fraudulent inducement counterclaim against the Baughs. Accordingly, we reverse the judgment of the Court of Appeals and reinstate the judgment of the trial court. We also

tax the costs of this appeal to Herman Novak and Faith Novak, jointly and severally, for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUSTICE