IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 7, 2016 Session

**TIM ADAMS ET AL. V. CMH HOMES, INC.**

**Appeal from the Chancery Court for McMinn County
No. 2014-CV-195     Jerri S. Bryant, Chancellor**

---

**No. E2015-01526-COA-R3-CV-FILED-APRIL 27, 2016**

---

The issue on this appeal is the enforceability of an arbitration agreement. Tim and Pamela Adams (Plaintiffs) bought a mobile home from CMH Homes, Inc. (Defendant). As part of the transaction, Plaintiffs signed an arbitration agreement after they were told by Defendant's sales manager that they "had to sign the papers in order to get the home moving." This statement was false, although the manager testified that he was unaware of its falsity at that time. Plaintiffs alleged fraudulent inducement with respect to the arbitration agreement. After a hearing, the trial court ruled that Plaintiffs established their fraudulent inducement claim. As a consequence, the court set aside the arbitration agreement. Defendant appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded for Further Proceedings**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

William S. Rutchow and Jennifer S. Rusie, Nashville, Tennessee, for appellant, CMH Homes, Inc.

Wilton Marble, Cleveland, Tennessee, for appellees, Tim Adams and Pamela Adams.

**OPINION**

**I.**

In October 2013, Plaintiffs decided to buy a manufactured home from Defendant. They paid a $500 deposit to hold the home they had selected. On November 25, 2013, Plaintiffs and general manager Mike Hagood completed a sales worksheet that reflected a sales price of $145,284.84, a payment schedule of two $50,674.71 payments, and a final

payment of $43,435.47. Athens Federal Community Bank (Lender) provided the financing. On December 23, 2013, Plaintiffs met with Lender's employee, Richard Boyd, who had arranged the financing. At that meeting, they signed the documents to close the loan. After the closing, Lender issued a check payable to Defendant in the amount of $50,674.71. That same day, Plaintiffs visited Defendant's East Ridge office, did a final walk-through of the home, and tendered the check to Defendant. The check was deposited the next day.

On December 26, 2013, Hagood called the Plaintiffs and told them that he had "some additional paperwork we need you to sign so we can move this house." They met, and Hagood presented Plaintiffs with a packet of papers that included the "binding dispute resolution agreement." That document required the parties to submit certain types of claims to arbitration. The parties did not discuss the contents of the documents, nor was there any discussion as to how disputes were to be resolved. Mr. Adams would later testify that he briefly looked over the documents but did not read them. Plaintiffs testified that, prior to this meeting, they believed the transaction was already completed. They further testified that they relied on Hagood's assertion that they had to sign the documents in order to get the house moved to their property. Plaintiffs signed all of the documents presented, including the arbitration agreement.

Problems ensued with the delivery and installation of the home. Among other things, the subcontractor trucker ran the home into an overpass on Interstate 75, causing roof damage.[1] Plaintiffs filed their complaint on June 20, 2014, alleging negligence in the transport, repair, and installation of the home, breach of contract, and intentional and negligent misrepresentation. Defendant answered. Later, the parties attempted mediation, which proved unsuccessful. Plaintiffs moved for a scheduling order and the setting of the case for trial. On December 5, 2014, Defendant requested that the trial court deny their motion and stay the case pending a decision from the Supreme Court in *Berent v. CMH Homes, Inc.*, 466 S.W.3d 740 (Tenn. 2015), arguing that "*Berent* would directly impact the instant matter and whether this case should be pursued in arbitration pursuant to the parties' agreement."

The trial court mailed the attorneys for the parties a letter on April 27, 2015, informing them that the case was set for a jury trial in September 2015. The Supreme Court released its *Berent* opinion on June 5, 2015. On June 26, 2015, Defendant filed a motion to compel arbitration, arguing that *Berent* "examined an arbitration agreement that is virtually identical to the Binding Dispute Resolution Agreement [in this case] and

---

[1] In its answer, Defendant admitted that "the roof of the manufactured home sustained damage during transport to Plaintiffs' property by an independent contractor."

has held that it is not unconscionable as a matter of law and is therefore enforceable."[2] On July 6, 2015, Plaintiffs filed a response alleging that Defendant fraudulently induced them to sign the arbitration agreement and it was therefore invalid and unenforceable. Plaintiffs argued, in pertinent part, as follows:

> [Plaintiffs] maintain that the property closed on December 23, 2013 when they signed closing paperwork and delivered the first payment under the Sales Agreement. They note that they had signed the closing paperwork, had submitted payment under the contract and [Defendant] had accepted said payment on December 23, 2013. [Plaintiffs] maintain that three days later [Defendant] presented "additional paperwork" (the Binding Dispute Resolution Agreement) to them and told them they ***had to*** sign the "additional paperwork" so the home could be moved. However this statement was false as demonstrated by [Defendant's] sworn answer [to discovery interrogatories] of "yes" when asked "Do you maintain that you would have sold the home to the plaintiffs had the plaintiffs refused to sign the Binding Dispute Resolution agreement?" . . . [Defendant] had knowledge of the statement's falsity or utter disregard for its truth and an intent to induce reliance on the statement so [Plaintiffs] would sign the agreement.

(Italics, bold words, and underlining in original; citations to record omitted.) In support, Plaintiffs filed their affidavits stating that Hagood presented them with the "additional paperwork" on December 26, 2014, and told them they had to sign it to get the house moving. They each further said, "I was not informed that we could choose not to sign the paperwork and still buy the home. In fact I was told the opposite."

The trial court held a hearing on the issue of fraudulent inducement on July 29, 2015. Mr. Adams, Hagood, and Boyd testified. Hagood did not deny telling the Plaintiffs that they were required to sign the papers to get the house delivered, and said that he thought, at the time, that the statement was true. He testified that "[i]n the process

---

[2] As this statement suggests, ***Berent*** decided the issue of whether the terms of an arbitration agreement were so one-sided as to render the agreement unconscionable. 466 S.W.3d at 756-58. The ***Berent*** Court did not address fraudulent inducement except to "leave it for the trial court on remand to determine whether or to what extent further proceedings should be conducted to address Mr. Berent's claims of fraud." ***Id.*** at 758. The present case does not involve a claim of unconscionability, and therefore the concepts espoused in ***Berent*** are of limited applicability in the present case.

of this lawsuit, our internal counsel made me aware there were occasions that our company had sold a home without requiring that document." On August 6, 2015, the trial court entered an order in which it found that "Plaintiffs have met their burden of proving their defense of fraudulent inducement." The court ruled that "[t]he Binding Dispute Resolution Agreement is set aside, the Motion to Compel Arbitration filed by the Defendant is denied and this cause shall continue as scheduled." The trial court rejected Defendant's assertion that Plaintiffs had waived their fraudulent inducement claim by not raising it earlier in the litigation. Defendant timely filed a notice of appeal.

## II.

The issues raised on appeal are (1) whether the trial court erred in finding that Plaintiffs did not waive their claim of fraudulent inducement, and (2) whether the trial court correctly held that Plaintiffs proved that they were fraudulently induced to sign the binding dispute resolution agreement.

## III.

"When ruling on the appeal of a denial of a motion to compel arbitration, we follow the standard of review that applies to bench trials." *Mid-South Maintenance, Inc. v. Paychex, Inc.*, No. W2014-02329-COA-R3-CV, 2015 WL 4880855, at *3 (Tenn. Ct. App. W.S., filed Aug. 14, 2015) (quoting *Spann v. Am. Express Travel Related Servs. Co.*, 224 S.W.3d 698, 706–07 (Tenn. Ct. App. 2006)). Thus, our review is de novo on the record of the proceedings below with a presumption of correctness as to the trial court's factual findings, a presumption we must honor unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). We review the trial court's legal conclusions de novo with no presumption of correctness. *Oakes v. Oakes*, 235 S.W.3d 152, 156 (Tenn. Ct. App. 2007).

## IV.

Defendant argues that the trial court erred when it held that Plaintiffs did not waive their fraudulent inducement claim by failing to raise it in their complaint or in an amended complaint. Plaintiffs respond by pointing out two facts. First, they assert they were unaware of the fraudulent inducement, *i.e.*, Hagood's false statement that they had to sign the papers to get their home; and that they first became aware of its false nature when Defendant responded to interrogatories that it "would have sold the home to the plaintiffs [even if] the [P]laintiffs refused to sign the Binding Dispute Resolution agreement." Second, Plaintiffs argue that their response alleging fraudulent inducement was timely filed shortly after Defendant's motion to compel arbitration. None of these facts are in serious dispute. In an order entered on July 24, 2015, the trial court stated,

4

Defendant filed the instant Motion to Compel Arbitration and Stay Proceedings and an accompanying Memorandum of Law in Support on June 26, 2015, and Plaintiffs timely responded with a Response and a Memorandum of Law in Support raising the allegation of fraudulent inducement for the first time.

\* \* \*

Plaintiffs argued that the issue was not waived as their claim of fraudulent inducement was based upon discovery responses from the defendant which plaintiffs did not receive until February of 2015. Plaintiffs also noted that until roughly two weeks ago there was not a request to compel arbitration pending in this action and when Defendant filed the instant Motion to Compel Arbitration and Stay Proceedings, Plaintiffs timely filed a response raising the issue of fraudulent inducement. Plaintiffs also maintained that the Binding Dispute Resolution Agreement was a separate agreement. Plaintiffs maintained that, under these facts, the allegations of fraudulent inducement more closely resemble a defense (which is properly raised in a response) as opposed to a stand-alone claim.

Plaintiffs have not waived the issue of fraudulent inducement and should be given an opportunity to prove said allegation.

(Paragraph numbering in original omitted.) Plaintiffs filed their response on July 6, 2015, ten days after Defendant's motion to compel arbitration. Under these circumstances, we agree with the trial court that Plaintiffs' claim of fraudulent inducement was not waived.

The parties agree that the issue of fraudulent inducement is not properly subject to arbitration. The dispute resolution agreement provides that "[n]otwithstanding anything herein to the contrary, the jurisdiction of the Arbitrator, including objections with respect to the existence, scope, and validity of this Agreement, shall be determined solely by a court of competent jurisdiction, and not by the Arbitrator." As determined by the Supreme Court,

[g]enerally, whether a valid agreement to arbitrate exists between the parties is to be determined by the courts, and if a

5

complaint specifically challenges the arbitration clause on grounds such as fraud or unconscionability, the court is permitted to determine it[s] validity before submitting the remainder of the dispute to arbitration.

In determining whether there is a valid agreement to arbitrate, "courts generally . . . should apply ordinary state-law principles that govern formation of contracts[.]"

*Taylor v. Butler*, 142 S.W.3d 277, 283-84 (Tenn. 2004) (internal citations omitted); *accord* **Berent**, 466 S.W.3d at 746.

The elements of fraudulent inducement are well established and often stated as follows:

To prevail on a claim of fraudulent inducement, the party asserting the claim has the burden of proving that the defendant:

(1) made a false statement concerning a fact material to the transaction; (2) with knowledge of the statement's falsity or utter disregard for its truth; (3) with the intent of inducing reliance on the statement; (4) the statement was reasonably relied upon; and (5) an injury resulted from this reliance.

*Deal v. Tatum*, No. M2015-01078-COA-R3-CV, 2016 WL 373265, at *7 (Tenn. Ct. App. M.S., filed Jan. 29, 2016) (quoting **Baugh v. Novak**, 340 S.W.3d 372, 388 (Tenn. 2011)); *Regions Bank v. Bric Const., LLC*, 380 S.W.3d 740, 763 (Tenn. Ct. App. 2011).

Hagood testified that he was general manager of Defendant's Athens office, "responsible for the operation of that home center: sales, service, just the entire operation." Regarding the statement at issue, Hagood testified, in pertinent part, as follows:

Q. You guys told [Mrs. Adams], "Hey, I've got some additional paperwork we need you to sign so we can move this house," correct?

A. Yeah. We had additional – we had the closing papers for her to sign.

Q. Up until this point, when you meet [Plaintiffs] on the 26th, had you at any time explained mediation, arbitration, or alternate dispute resolution to either of the Adamses?

A. No, sir.

\* \* \*

Q. The documents that I've just been asking you about, are they all documents that are part of what you described as the closing packet?

A. Yes. They all print out together.

Q. They would all be signed at the same time?

A. Yes.

Q. You testified that Mr. Adams came in to sign the documents; is that correct?

A. That's correct.

Q. Did he ask any questions about the documents?

A. I'm sure he did. Nothing that I recall out of the ordinary.

Q. Did he refuse to sign any of the documents?

A. No, sir.

Q. In the 60 or 70 closings per year you've done, have you ever had somebody refuse to sign any of the documents?

A. No, sir.

Q. Have you ever had a situation where somebody told you they were not going to sign this Binding Dispute Resolution Agreement?

A. I have not.

Q. Did you ever have occasion to call someone to find out what you would do in that situation?

A. I haven't.

* * *

Q. In fact, since it's part of your closing packet, your standard practice is to tell them, "You've got to sign these papers if you want the house"? Don't you?

A. Yes.

As already stated, Defendant responded to Plaintiffs' interrogatory asking "Do you maintain that you would have sold the home to the plaintiffs had the plaintiffs refused to sign the Binding Dispute Resolution agreement?" by saying, "Yes." This sworn response demonstrates that Hagood's statement to the Plaintiffs – that they had to sign all the documents before the house could be moved – was false, a fact Plaintiffs learned when they received Defendant's answers to their interrogatories. Defendant asserts that Hagood did not know it was false at the time; however, what is obvious to us is that Hagood took no steps, prior to the sale to Plaintiffs, to ascertain whether the statement was true or false. We hold that Hagood's statement was made with "utter disregard for its truth," which satisfies the second element of the test for fraudulent inducement. General manager Hagood, who testified he was selling 60 to 70 homes per year, routinely told customers that they were required to sign the papers, including the dispute resolution agreement, to get their home delivered. This statement was totally false. The fact that Hagood did not know the statement was false when he made it is not the most significant fact in this case. What is very material is Defendant's failure to make sure that its general manager was fully versed in his duty of handling the closing of sales. This suit is against CMH, not Hagood. CMH's failure to ensure that its general manager was fully informed shows utter disregard for the truth.

Regarding the materiality of this statement, Plaintiffs argue that it was enormously material to them to get their home delivered to their property and set up as soon as possible. This is because, among other reasons, at the time of the sale, Plaintiffs, along

8

with their eleven-year-old daughter, a dog, and a cat, were living in an eight foot by twenty foot camper trailer for which they had paid $2,000. Most of their personal property was in a storage unit. Hagood testified that he knew they were living in a trailer on their property. Moreover, at the time Hagood told them they had to sign the papers to get the home, Plaintiffs had already paid Defendant $50,674.71 as partial payment for the home. Defendant characterizes this payment as a "deposit," an assertion that the trial court rejected. This assertion prompted the court to observe, "[t]here is even disagreement on whether [Plaintiffs] would have gotten their money back had they refused to sign any of it." Under the particular facts and circumstances of this case, we hold that the evidence does not preponderate against the trial court's finding that the Plaintiffs have established their fraudulent inducement claim.

## V.

The judgment of the trial court is affirmed. Costs on appeal are assessed to the appellant, CMH Homes, Inc. This case is remanded for further proceedings consistent with this opinion.

_____
CHARLES D. SUSANO, JR., JUDGE

9