IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 7, 2024 Session

## JOHN PIRTLE D/B/A THIRD COAST BUILDERS v. THE TUNNEY GROUP, LLC ET AL.

**Appeal from the Chancery Court for Davidson County**
No. 21-1046-II        Anne C. Martin, Chancellor

———————————————————

**No. M2023-01830-COA-R3-CV**

———————————————————

A general contractor hired a subcontractor to perform plumbing work on a condominium construction project. After completing the first phase of the work, the general contractor paid a portion of the total contract amount to the subcontractor. The general contractor then separately hired the subcontractor to do some excavation work on the project, though no contract was created for this aspect of the work, and no payment amount was discussed. After completion of the excavation work, a dispute arose over the amount charged to the general contractor by the subcontractor. The general contractor refused to pay what it believed to be too high a fee. The subcontractor insisted that the amount charged was reasonable. The general contractor then asserted that the subcontractor had materially breached the plumbing contract during the first phase. The general contractor eventually terminated the contract. The subcontractor filed suit. After a bench trial, the trial court concluded that the general contractor breached the parties' contract, awarding lost profits and attorney's fees to the subcontractor pursuant to the plumbing contract. The trial court also awarded damages to the subcontractor for the excavation work under a quantum meruit theory. The general contractor appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

JEFFREY USMAN, J., delivered the opinion of the court, in which THOMAS R. FRIERSON II, and W. NEAL MCBRAYER, JJ., joined.

Mark Alexander Carver and Todd E. Panther, Nashville, Tennessee, for the appellants, American Contractors Indemnity Company, The Eagle Nashville, LLC, and The Tunney Group, LLC.

Timothy H. Nichols, Nashville, Tennessee, for the appellee, John Pirtle.

## OPINION

### I.

This case involves a dispute between a general contractor and a subcontractor related to work performed on a condominium project in Nashville. Ed Tunney, an experienced contractor, was the principal of both the project's owner, The Eagle Nashville, LLC, and the general contractor, The Tunney Group (collectively Tunney). In April 2020, Tunney contracted with Appellee John Pirtle d/b/a Third Coast Builders, a licensed master plumber, to do $120,000 of plumbing work on the project. The scope of work included primarily interior plumbing work, along with additional tap and sewer work.

The interior plumbing work consisted of two phases, the rough-in phase and the trim-out phase. By March 2021, Mr. Pirtle had completed the rough-in phase. In doing so, Mr. Pirtle, who oversaw the work, made use of independent contractors who were not individually licensed to assist in his work. The work passed inspection. Tunney paid Mr. Pirtle 60% of the contract price, approximately $69,000. Although Mr. Pirtle's expenses exceeded that amount at this point in the process, he accepted the payment, expecting to receive the remainder after completing the trim-out phase. After the rough-in phase was over, Mr. Pirtle had to wait for other subcontractors to finish their work before he could complete the trim-out phase.

During this interregnum, Tunney approached Mr. Pirtle about excavation, hauling, and grading work on the project involving removing a portion of an embankment and allowing the construction of a retaining wall. This work was unrelated to the plumbing contract. In addition to being licensed as a master plumber, Mr. Pirtle is also registered with the Metropolitan Government of Nashville and Davidson County Public Works Department to perform excavation. Mr. Pirtle agreed to perform the work. However, no written contract was created, and no price was discussed. This was not the first time that Mr. Pirtle had done excavation work on the condominium project. In March 2020, he had removed 25 loads of asphalt at a cost of $750 per load, for which Tunney paid him for his services.

Like the plumbing work, the latter excavation work consisted of two phases: rough grading and finish grading. Tunney was "anxious for the work to be done quickly"; accordingly, Mr. Pirtle promptly performed the work over weekends on an expedited basis. In April 2021, Mr. Pirtle completed the rough grading, which involved hauling off 18 loads of dirt. In May 2021, Mr. Pirtle completed the finish grading, which involved hauling off 109 loads of dirt. The work had to be completed at particular elevations pursuant to the site plan because of concerns about storm water and drainage. A laser level had to be used throughout to ensure compliance with the elevation requirements. Mr. Pirtle himself operated the laser level on the site and was directly involved in the work. Because he

owned some but not all of the necessary equipment for the project, Mr. Pirtle used some of his own equipment and leased other equipment, including trucks. He also hired contract labor to complete the work. His expenses for this work were $32,686.69. This did not include his time working on the project. Mr. Tunney had personally observed some of the work, and he raised no complaints about the quality of the work either at the time or later.

On June 3, 2021, Mr. Pirtle sent a $74,400 invoice for the excavation work to Tunney. The invoice requested $9,000 for the April work, charging $500 for each of the 18 loads hauled. It also requested $65,400 for the May work, charging $600 for each of the 109 loads of dirt hauled. Mr. Pirtle testified that this was his first excavating job like this, so he based the invoice amount on the industry standard of charging per load, which he learned from talking to other contractors and searching on the internet.

Tunney deemed the invoice to be exorbitant and refused to pay it. Just over a week later, on June 11, Tunney sent a letter to Mr. Pirtle notifying him that he was in default on the plumbing contract. Tunney alleged three grounds for default: (1) improperly installed shower controls and showerheads; (2) failing to install the elevator pit pump; and (3) potentially using unlicensed workers to complete the rough-out phase. In the letter, Tunney provided only five days to cure the alleged errors, despite the plumbing contract providing Mr. Pirtle 30 days to cure.

Mr. Pirtle's attorney responded by letter, addressing each of the three alleged breaches separately. As to the installation of the shower controls and showerheads, the letter explained that they were installed to be ADA-compliant and passed inspection. Mr. Pirtle offered to relocate the items for an additional $925. Next, Mr. Pirtle explained that the elevator pit pump fell outside the scope of the plumbing contract, but he asked for any documentation that would show otherwise. Finally, as to the allegedly unlicensed workers, the letter stated that Mr. Pirtle was unaware of "any licensing violations" related to the project. Mr. Pirtle asked that if Tunney had any information to the contrary to "please provide it." After considering Mr. Pirtle's responses, Tunney agreed to pay Mr. Pirtle an additional $925 to change the location of the shower controls and showerheads, resolving that dispute. The parties also appeared to have resolved the elevator pit pump issue after discussing it. Tunney provided no response or additional information related to alleged licensing violations.

Months later, in September 2021, Tunney asked Mr. Pirtle to begin working on the trim-out phase. When Mr. Pirtle arrived at the site, it was not ready for him to do the trim-out work, with other work being performed that impeded his access. The toilets also had not arrived, and the cabinets and countertops were not yet installed. According to Mr. Pirtle, he came to the site three different times in September attempting to complete the work, but he was only able to do portions of it. Tunney disagreed, asserting the site was ready for the trim-out work to be done. On September 25, 2021, Tunney notified Mr. Pirtle that it was terminating the contract. The letter stated that Tunney was terminating the

contract because Mr. Pirtle had not cured the alleged defects from the earlier June 11 letter within 30 days. Tunney then hired GoFlo Plumbing LLC to complete the trim-out work.

Mr. Pirtle filed a complaint against Tunney for breach of contract, for a materialman's lien, for unjust enrichment, and an action related to a lien bond. Following the bench trial, the trial court issued an order in which the trial court made detailed findings of fact and reached conclusions of law. First, the trial court addressed the excavation work. Finding that there was no meeting of the minds as to the payment for this work, the court held that there was no express contract. The trial court instead applied quantum meruit and unjust enrichment principles, holding that under either theory, Mr. Pirtle was "entitled to payment for his excavating and grading work based on the reasonable value of the services." The court based its "reasonable value" determination on expert testimony at trial. Mr. Pirtle's expert, Wyatt Hoover, had 20 years of experience, had no relation to Mr. Pirtle, and had never worked with him. Mr. Hoover explained that there were various ways to value this kind of work, either by the truckload or by cubic yard. According to Mr. Hoover, the industry standard rate for the April work was $350 per load of rough grading and $525 per load of finish grading for the May work. He also stated that there was potential for a markup for expedited work. Tunney provided two experts, one of whom the court found not to be credible. The other, Derek Preston, had worked for Tunney on this project and hoped to work for him again. Mr. Preston stated that a fair price for this excavation work would be approximately $250 per load. His valuation was for smaller-sized trucks than Mr. Pirtle had actually used and did not account for the nature of the grading work.

The court, in analyzing the various exert testimony, credited Mr. Hoover's as being the most reliable. The court then concluded that it would award Mr. Pirtle $65,000 for the excavation work. The trial court determined value on a per load basis and in relation to the nature of the grading work performed, with amount ultimately totaling $63,525. The trial court added a markup of $1,475 for the expedited nature of the work, raising the total to $65,000. In arriving at this number, the trial court specifically rejected Tunney's argument that Mr. Pirtle's recovery should be limited to a 10-15% markup compared to his costs. The trial court stated that this method was not reasonable, given that each contractor's costs would be different. Additionally, the trial court found that, given the expert testimony, a per-load cost basis was actually the industry standard.

As to the breach of contract claim, the trial court addressed each of the three alleged defaults that Tunney claimed were not cured and which Tunney asserted justified its termination of the plumbing contract. In doing so, the trial court made detailed findings. The trial court stated the following:

> In the Notice Letter, the Tunney Group identified three areas of purported deficiency by Plaintiff and notified him of the demand for correction [within five days]. The notice period for cure was inconsistent

with the Contract requirements, but that error was corrected by the allowance of more than thirty days to "cure" the problem. The Court finds that [Mr. Pirtle] did indeed, to the extent they were valid issues, cure them prior to the September communication and eventual termination.

Specifically, item one regarded the showerheads. The Court finds the Tunney group did not provide specifications regarding their placement such that their placement otherwise was a breach. Plaintiff followed the limited instructions he was given and had a commercially reasonable explanation regarding how he placed them. Moreover, the Metro Codes approved the work. Plaintiff changed the work per Mr. Tunney's instructions, albeit for an additional payment of $925, which was not unreasonable given the lack of prior instructions. This item was properly addressed by [Mr. Pirtle] prior to the September communication or termination.

Item two regarded the elevator pit pump which was listed on the P1 or plumbing plans as part of the plumbing work. The undisputed testimony from Mr. Pirtle is that he did the rough in but mistakenly thought the elevator company was installing the pump. Once he received the Notice Letter, he offered to do the installation and ordered the pump for installation, to be reimbursed per the Contract. This is verified in his September 16, 2021 e-mail to Mr. Tunney . . . . Mr. Pirtle testified he was[, nevertheless,] told not to the do the installation, and the Tunney group did not provide proof otherwise. Thus, this item was also properly addressed by Plaintiff prior to the September termination.

Item three was an accusation of "potentially using unlicensed workers." . . . In his attorney's response letter, Plaintiff denied the allegation and asked for proof to the contrary . . . . It is undisputed the Tunney Group never followed up with Plaintiff by either asking for additional information or explaining the concern. At trial, Mr. Tunney asserted that a contract employee or non-W2 worker must have his/her own license and cannot work under the license of the master plumber who pulled the permit and is supervising the job. This issue was not briefed and was not otherwise addressed with Plaintiff after the Notice letter and his response. [Mr. Pirtle] reasonably assumed he "cured" this issue to the degree it required cure, and the Tunney Group could not rely upon it to terminate the Contract.

In summary, the Notice Letter and items therein did not provide a basis for the Tunney Group to terminate the Contract.

The trial court also addressed an argument raised by Tunney that Mr. Pirtle did not timely complete the trim-out work, leading to a breach. The trial court held that the contract

did not provide any specific timelines for completion and that Mr. Pirtle attempted to complete the work, but the site was not ready for him to perform his work. Therefore, the court concluded that Tunney breached the contract by terminating the agreement without cause. Given Tunney's breach, the court held that Mr. Pirtle was entitled to his lost profits. Because Mr. Pirtle intended to complete the remainder of the project himself, the court awarded Mr. Pirtle $51,000 in lost profits for the plumbing contract, the remaining amount owed on the contract.

The parties dueled over whether attorney's fees and interest were provided for in the contract. The trial court concluded that interest was not provided for but that attorney's fees were provided for under the parties' contract. Mr. Pirtle's counsel then filed a fee affidavit seeking $64,200 in attorney's fees and $4,549.82 in expenses. The trial court awarded half of that to Mr. Pirtle, for a total of $34,814.92.

Mr. Pirtle filed a motion to alter or amend, seeking a more thorough analysis of the award of attorney's fees and clarification that American Contractors Indemnity Company, as the surety, was jointly and severally liable on the bond for the $65,000 unjust enrichment damages. Tunney did not oppose this motion. The trial court granted it and entered an order specifically addressing the reasonableness of the attorney's fees and the bond liability. The trial court attributed the decision to award half of the attorney's fees amount to half of the legal work being in support of the quantum meruit excavation claim, which was not included within the scope of the contract, rather than the contract claim.

Tunney appeals, raising four issues. These issues include the following:

1. Did the defendant validly terminate the plumbing contract based on the plaintiff's uncured material breach in failing to provide the plumbing services in compliance with all applicable state laws, including Tennessee's contractor licensing laws?
2. Does a licensed plumber who uses unlicensed independent contractors not employed by him to perform plumbing work violate Tennessee's contractor licensing laws and the public policy of Tennessee, such that the licensed plumber may recover only his documented expenses shown by clear and convincing proof and not any lost profits?
3. Did the trial court err in awarding the plaintiff $65,000—a 100% profit margin—for excavating work on a quasi-contract claim for unjust enrichment/quantum meruit where all of the expert witnesses—including the plaintiff's own expert—agreed that a 100% profit margin for the work was unreasonable?
4. Does the plumbing contract authorize the trial court's award of attorneys' fees to the plaintiff in this case?

II.

With regard to the standard of review, Tennessee appellate courts "review the trial court's findings of fact after a bench trial 'de novo upon the record with a presumption of correctness, 'unless the preponderance of the evidence is otherwise.'" *Mathes v. 99 Hermitage, LLC*, 696 S.W.3d 542, 552 (Tenn. 2024) (quoting *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017) & Tenn. R. App. P. 13(d))). Furthermore, "[a] trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness." *Lovett v. Cole*, 584 S.W.3d 840, 858 (Tenn. Ct. App. 2019).

III.

Turning first to Mr. Pirtle's use of unlicensed workers to assist with his plumbing work, Tunney argues on appeal that the use of unlicensed workers undermines in two ways the trial court's conclusions as to recovery on the plumbing contract. First, Tunney argues that by using unlicensed workers, Mr. Pirtle defaulted, allowing Tunney to terminate the contract. Second, Tunney argues that the use of unlicensed workers statutorily bars Mr. Pirtle from receiving lost profits, limiting him to his documented expenses, pursuant to Tennessee Code Annotated section 62-6-103(b).

In response, Mr. Pirtle argues that his actions neither violated the contract nor Tennessee Code Annotated section 62-6-103(b). Mr. Pirtle also contends that the trial court properly concluded that Tunney waived these issues by failing to respond to Mr. Pirtle's inquiry during the cure period and by failing to properly raise his statutory argument regarding damage limitations before the trial court. Mr. Pirtle observes that after he received the notice letter informing him of the alleged default, he asked for details because he knew of no licensing issues as he was a licensed master plumber overseeing the work. Instead of responding, Tunney asked Mr. Pirtle to come back and finish phase two of the plumbing work. The trial court concluded that, based on this course of action, Mr. Pirtle reasonably believed that, to the extent there was any licensing issue leading to a default, it was cured. Furthermore, Mr. Pirtle points out that Tunney did not plead or raise the statutory licensing issue in its answer, pre-trial brief, or anywhere else before first mentioning it as a legal issue in closing argument at trial. Mr. Pirtle asserts that Tennessee Rule of Civil Procedure 8.05 required that Tunney plead this alleged statutory violation, which it did not. Given these deficiencies from Tunney, Mr. Pirtle argues that he was not on notice that it was an issue that he needed to address before the trial court. Mr. Pirtle also argues that, had he known this was to be an issue, he would have introduced additional evidence and modified his own pleadings, including by seeking recovery as to his unpaid costs on phase one of the project.

In response, Tunney argues that it did not waive its contention of statutory violation in connection with licensing issue before the trial court for three reasons: (1) because the matter was tried by consent, (2) because it did make the argument before the trial court, and (3) because the licensing issue was a violation of state law that cannot be waived.

Tunney quite properly notes that Tennessee law allows for issues to be tried by consent. Tennessee Rule of Civil Procedure 15.02 provides that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Tunney fails to direct us to anywhere in the record reflecting express consent, nor has our review of the record revealed express consent. Alternatively, "[i]mplied consent hinges on the issues that were actually litigated by the parties . . . ." *McLemore v. Powell*, 968 S.W.2d 799, 803 (Tenn. Ct. App. 1997); *see also In re Glenn B.*, 2023 WL 8369209, at *10 n.9. That is, "implied consent arises from the parties and trial court understanding something to be at issue and actually litigating it." *In re Glenn B.*, 2023 WL 8369209, at *10 n.9 (citing *Branch Banking & Trust Co. v. Hill*, 582 S.W.3d 221, 236 (Tenn. Ct. App. 2019); *see also In re Mykeena C.*, No. M2024-00206-COA-R3-PT, 2025 WL 2048534, at *6 (Tenn. Ct. App. July 22, 2025)). There is discordance in Tunney's contention insofar as it both objects to the trial court treating its statutory argument as waived and simultaneously contends that the issue was impliedly tried by consent. The trial court in the present case did not understand the statutory licensure argument as having been actually litigated before it; instead, the trial court regarded the raising of this issue as untimely. We cannot agree with Tunney's assertion that its statutory violation argument was tried by consent.

Tunney asserts that it did raise the statutory violation argument before the trial court. It is well settled in Tennessee that issues not effectively raised in the trial court are waived on appeal. *Chimneyhill Condo. Ass'n v. Chow*, No. W2020-00873-COA-R3-CV, 2021 WL 3047166, at *15 (Tenn. Ct. App. July 20, 2021) (citing *Barnes v. Barnes*, 193 S.W.3d 495, 501 (Tenn. 2006) ("Issues not raised in the trial court cannot be raised for the first time on appeal.")); *Main St. Mkt., LLC v. Weinberg*, 432 S.W.3d 329, 337 n.4 (Tenn. Ct. App. 2013) ("Issues not raised at trial will not be considered for the first time on appeal.")). The Tennessee Supreme Court has stated that "there is little difference between an issue improperly raised before the trial court at the last minute and one that was not raised at all." *In re Adoption of E.N.R.*, 42 S.W.3d 26, 32 (Tenn. 2001) (citing *Mallicoat v. Poynter*, 722 S.W.2d 681, 682 (Tenn. Ct. App. 1986) ("The jurisdiction of this court is appellate only and we consider those issues which are *timely* brought to the attention of the trial court." (emphasis added))). Given the pleading deficiencies in the present case and failure to raise the statutory violation argument prior to closing arguments, we find no error in the trial court's conclusion that Tunney did not timely raise its argument.

Tunney contends that even if its argument would otherwise be deemed waived, Tunney *could not* waive the alleged statutory licensing requirement because doing so violates Tennessee public policy. To support its argument, Tunney cites *Baugh v. Novak*, 340 S.W.3d 372 (Tenn. 2011), for the proposition that the invalidity of a contract that violates public policy cannot be waived.

The Tennessee Supreme Court determined in *Baugh* that, while appellate courts are typically limited to arguments raised and litigated by the parties, they can raise a public

policy concern affecting the validity of a contract *sua sponte*. *Id.* This is because courts have "not only the authority but also the responsibility to invalidate a private contract that is contrary to the public policy of this state." *In re Baby*, 447 S.W.3d 807, 822 (Tenn. 2014) (citing *Baugh*, 340 S.W.3d at 382).

Nevertheless, *Baugh* does not ultimately support Tunney's argument. The *Baugh* Court reasoned as follows:

> [E]xercising this largely undefined authority requires courts to act with great delicacy. The need for delicacy arises because exercising the authority "to declare contracts as void as against public policy is in tension with freedom of contract and the need to bind parties to their voluntary agreements."

> Tennessee law recognizes that "[t]he individual right of freedom of contract is a vital aspect of personal liberty." Accordingly, [the Tennessee Supreme] Court has cautioned that

>> [i]t must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because, if there is one thing which more than another public policy requires, it is that [persons] of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice. Therefore you have this paramount public policy to consider; that you are not lightly to interfere with this freedom of contract.

> The principle of freedom of contract is "rooted in the notion that it is in the public interest to recognize that individuals have broad powers to order their own affairs by making legally enforceable promises." This form of private autonomy, "premised on the ability of individuals to order their own affairs, and the desirability of allowing them to do so," stands at the foundation of contract law. In a market economy, "economic decisionmaking, at least at the microeconomic level, is left substantially to the individual . . . . [T]he individual is substantially free to order his or her economic affairs as he or she chooses."

> Drawing upon this understanding, this Court has often "held that public policy is best served by freedom of contract . . . ." Tennessee, both in its statutory and case law, "recognize[s] a strong public policy of individual autonomy, i.e. freedom of contract, as courts allow parties to strike their own

bargains, absent a supervening legal reason to restrict that economic liberty." The course of development of "[c]ontract law in Tennessee plainly reflects the public policy allowing competent parties to strike their own bargains."

Nevertheless, while noting that "[t]he right of contract is confessedly an inherent part of both the right of 'liberty' and the right of 'property,'" we have also concluded that this right is not absolute. The freedom of contract must give way to the preservation of the public health, safety, morals, or general welfare. Thus, although freedom of contract is of vital importance, it is not an absolute right unbounded or without limits. Among the limitations on the freedom to contract is that individuals can contract "as they see fit so long as such a contract is not against public policy."

*Baugh*, 340 S.W.3d at 382-83 (citations omitted).

The *Baugh* Court noted that Tennessee's test for assessing invalidation on public policy grounds is a longstanding one. *Id*. at 383. Cautioning that courts must "[e]xercise appropriate judicial restraint," the Tennessee Supreme Court indicated that

the courts will decline to enforce a contract on public policy grounds only (1) when the violation of public policy is clearly established, (2) when the violation is inherent in the contract itself, not collateral thereto, or when the contract's purpose taints it with illegality, and (3) when a clear public detriment will probably occur as a result of the contract or where the object of the contract tends to injure the public. The courts should be even more circumspect about declining to enforce a contract on public policy grounds when the party seeking to invalidate the contract has received the benefit of the other party's performance.

*Id.* at 383-84 (footnotes omitted).

Tunney does not develop an argument to address how the circumstances of the present case fit these requirements. "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her." *Sneed v. Bd. of Pro. Resp. of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010). Even if we were to assume that Tunney's argument is sufficiently developed, there is absolutely no showing that any violation of public policy is inherent in the contract itself or that the contract's purpose taints it with illegality. To the contrary, Tunney asserts that Mr. Pirtle violated the contract by using unlicensed subcontractors despite Mr. Pirtle having overseen their work. Furthermore, Tunney has provided no authority or argument to explain how *Baugh*'s reasoning should apply to a party's alleged breach of a contract where the contract itself is valid.

- 10 -

Ultimately, we find no error in the trial court's finding that Tunney, not Mr. Pirtle, breached the parties' contractual agreement regarding its handling of this matter. Similarly, we find no error in the trial court's conclusion that Tunney's statutory violation argument was untimely and inadequately raised.

IV.

Next, we turn to Tunney's argument that the parties' contract did not provide for attorney's fees. We review issues of contract interpretation de novo. *Dick Broad. Co. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013) (citing *Perkins v. Metro. Gov't of Nashville & Davidson Cnty.*, 380 S.W.3d 73, 80 (Tenn. 2012)).

With regard to attorney's fees,

> Tennessee "adheres to the 'American rule' for an award of attorney fees." Attorney fees are not ordinarily an element of contract damages . . . . "Under the American rule, 'a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American rule applies, allowing for recovery of such fees in a particular case.'" In *Cracker Barrel* [*Old Country Store, Inc. v. Epperson*], [the Tennessee Supreme] Court held that, "[i]n the context of contract interpretation, Tennessee allows an exception to the American rule only when a contract *specifically or expressly* provides for the recovery of attorney fees." . . . 284 S.W.3d [303, 308 (Tenn. 2009)] (citing *House v. Est. of Edmondson*, 245 S.W.3d 372, 377 (Tenn. 2008) ("The American rule provides that a party in a civil action may not recover attorney's fees absent a *specific* contractual or statutory provision providing for attorney's fees . . . ." (emphasis added))); *Pullman Standard* [*Inc. v. Abex Corp.*, 693 S.W.2d 336, 338 (Tenn. 1985)] ("We continue to adhere to the rule in Tennessee that attorneys' fees are not recoverable in the absence of a statute or contract specifically providing for such recovery . . . ."); *Pinney v. Tarpley*, 686 S.W.2d 574, 581 (Tenn. Ct. App. 1984) ("In the absence of an *express* agreement to pay attorney's fees for enforcement of a contract, such are not recoverable in Tennessee.") (emphasis added). The takeaway from these authorities is this: "If a contract does not specifically or expressly provide for attorney fees, the recovery of fees is not authorized." *Cracker Barrel*, 284 S.W.3d at 308.

*Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 566 S.W.3d 671, 705 (Tenn. 2019) (emphasis original and some citations omitted).

The Tennessee Supreme Court extensively explored in its 2019 decision in *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tennessee, Inc.*

- 11 -

Tennessee's approach to contract interpretation.   566 S.W.3d 671 (Tenn. 2019). Addressing Tennessee judicial decisions on contract interpretation, the Tennessee Supreme Court therein stated, in part, the following:

> Tennessee cases have . . . eschewed an extreme textual approach. Instead, they reflect balance; they demonstrate a definite focus on the written words in the parties' contract, but they also consider evidence related to the situation of the parties and the circumstances of the transaction in interpreting those words.  For example, in *Penske Truck Leasing Co. v. Huddleston*, the Court said: "The intention of the parties is to be determined by a fair construction of the terms and provisions of the contract, by the subject matter to which it has reference, by the circumstances of the particular transaction giving rise to the question, and by the construction placed on the agreement by the parties in carrying out its terms."  795 S.W.2d 669, 671 (Tenn. 1990). Following *Penske*, the Court in *Hughes v. New Life Development Corp.* stated, "The search for the parties' intent should focus on the four corners of the contract, the circumstances in which the contract was made, and the parties' actions in carrying out the contract."  387 S.W.3d 453, 465 (Tenn. 2012) (citations omitted).  [The Tennessee Supreme] Court has similarly held that discerning the contracting parties' intentions includes taking into consideration their situation, their motivations, their respective interests, and other contextual circumstances.  *See*, *e.g.*, *City of Columbia v. C.F.W. Constr. Co.*, 557 S.W.2d 734, 739 (Tenn. 1977) ("The evidence of intent is to be found in the language used by the parties . . . considered in the light of their respective interests and other relevant circumstances . . . and in the practical construction given to it by the parties . . . ."); *Kroger Co. v. Chem. Secs. Co.*, 526 S.W.2d 468, 471 (Tenn. 1975) ("While this lease contract cannot be varied by oral evidence 'the course of previous dealings, the circumstances in which the contract was made, and the situation of the parties as aids in determining the meaning of the contract—are matters proper to be looked to by the court in arriving at the intention of the parties to the contract.'") [(citation omitted)]; *Ashley v. Volz*, 218 Tenn. 420, 404 S.W.2d 239, 242 (1966) (holding that the parties' "intention may be ascertained by looking to the situation of the parties; the motives which induced the agreement; and the objects and purposes designed to be effected thereby"); *Petty v. Sloan*, 277 S.W.2d [355,] 360 [(Tenn. 1955)] ("In getting at [the parties'] intention we of course do not determine what the state of the mind was of the parties at the time the contract was executed but rather what their intention was as actually embodied and expressed in the instrument as written."); *Stevenson v. Lima Locomotive Works*, 180 Tenn. 137, 172 S.W.2d 812, 814 (1943) ("The intention of the parties . . . must be found in the contract itself, as well as the situation of the parties . . . and use of the subject matter of the contract.").

In *Hamblen County v. City of Morristown*, [the Tennessee Supreme] Court considered extrinsic evidence in the form of the parties' post-contract behavior, i.e., the rule of practical construction. 656 S.W.2d 331, 333-35 (Tenn. 1983). The Court used language that approved consideration of extrinsic evidence of context, even for interpretation of a contract that seemed facially unambiguous, with the important qualification that such evidence cannot be used to modify, expand, or restrict the contract:

> The court in interpreting words or other acts of the parties puts itself in the position which they occupied at the time the contract was made. In applying the appropriate standard of interpretation even to an agreement that on its face is free from ambiguity it is permissible to consider the situation of the parties and the accompanying circumstances at the time it was entered into—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning to be given to the agreement.

*Hamblen Cnty.*, 656 S.W.2d at 334 (quoting Restatement of Contracts § 235(d) and comment); *see also Burress v. Sanders*, 31 S.W.3d 259, 265 (Tenn. Ct. App. 2000) (quoting Bryan A. Garner, *The Elements of Legal Style* 7 (1991)) (noting that "everything [in contract interpretation] hangs on context and purpose").

Some of the cases with the strongest language on contextual principles also use textual principles as well, and vice-versa. In *Hughes*, the Court used language approving the use of evidence on "the circumstances in which the contract was made, and the parties' actions in carrying out the contract," . . ., but then used the extrinsic evidence primarily to "buttress" the interpretation of the text of the contract . . . . In *Petty v. Sloan*, often cited for its strong language in support of the textual approach, the Court went on to describe extrinsic evidence in the record and explicitly consider it: "In reading and studying this contract we of course must construe it with reference to the situation of the parties, the business to which the contract relates and the subject matter as appears from the words used." 277 S.W.2d at 359 . . . .

Looking at the broad range of Tennessee contracts cases, it is clear that Tennessee courts have sought, albeit imperfectly, to achieve balance in contract interpretation. The central principle endures, to interpret contracts so as to ascertain and give effect to the intent of the contracting parties . . . . In effectuating this principle, our courts have noted that judges "are entitled to place themselves in the same situation as the parties who made the

contract, so as to view the circumstances as they viewed them, and so as to judge of the meaning of the words and of the correct application of the language to the things described." *Staub v. Hampton*, 101 S.W. [776,] 785 [(Tenn. 1907) (quotation omitted)]. Courts should not be "shut out from the same light which the parties enjoyed when the contract was executed." *Staub*, 101 S.W. at 785 . . . .

However, the strong strain of textualism in Tennessee caselaw demonstrates resolve to keep the written words as the lodestar of contract interpretation . . . . Tennessee has rejected firmly any notion that courts are a fallback mechanism for parties to use to "make a new contract" if their written contract purportedly fails to serve their "true" intentions. *See Petty*, 277 S.W.2d at 359 . . . . Tennessee courts "give primacy to the contract terms, because the words are the most reliable indicator—and the best evidence—of the parties' agreement when relations were harmonious, and where the parties were not jockeying for advantage in a contract dispute." [Steven W. Feldman, 21 Tenn. Practice: Contract Law and Practice § 8:14 (June 2018).]

In short, Tennessee cases cite both textualist and contextualist principles; consideration of context evidence does not eclipse other canons of contract interpretation but rather cooperates with them. Thus, as in other states, Tennessee's jurisprudence on contract interpretation "evades tidy classification as textualist or contextualist." [Lawrence A. Cunningham, *Contract Interpretation 2.0: Not Winner-Take-All but Best-Tool-for-the-Job*, 85 Geo. Wash. L. Rev. 1625, 1627 (Nov. 2017).]

*Individual Healthcare Specialists*, *Inc.*, 566 S.W.3d at 692-94 (footnotes and some citations omitted).

Interpreting the parties' contract in its final order, the trial court held, after awarding Mr. Pirtle lost profits for Tunney's breach of contract, that "under the Contract, [Mr. Pirtle] is entitled to his attorney's fees for pursuing the contract claim." After Mr. Pirtle's attorney submitted his fee request and affidavit, the court awarded $34,814.91 in attorney's fees and costs, the portion of the fees the trial court attributed to the breach of contract claim, discounting the portion attributable to the quantum meruit claim.

The contractual language at issue in the present case is as follows:

**7. PAYMENT.** Payment shall be made to John Pirtle d/b/a Third Coast Builders, Lebanon, Tennessee 37087. Client agrees to pay the total sum of $120,000.00 . . . as follows: Payments will be disbursed per phase of project.

In addition, client will pay for cost of materials for water and sewer taps at the time of delivery.

   Refer to Addendum A (attached) for project schedule and distribution of payments. In the event of a change order, both parties will sign and agree to the change order.

If any invoice is not paid when due, interest will be added to and payable on all overdue amounts at 5% (percent) per year, or the maximum percentage allowed under applicable laws, whichever is less. Client shall pay all costs of collection, including limitation, reasonable attorney fees. In addition to any other right or remedy provided by law, if client fails to pay for the Services when due, Contractor has the option to treat such failure to pay as a material breach of this Contract, and may cancel this Contract and/or seek legal remedies.

On appeal, Tunney argues that the trial court erred in interpreting this contractual language to provide for attorney's fees because the paragraph that includes the attorney's fee language begins with "If any invoice is not paid," and here, there was no unpaid invoice. As set forth in its briefing, Tunney's argument hinges on its belief that the attorney fee provision is limited by the unpaid invoice language in the first sentence of the second full paragraph. The trial court, however, concluded that the attorney's fees provision was not limited to unpaid invoices, but instead included cost of collection of the payment amount due under the contract.

Having considered the parties' arguments and their contract, we conclude the trial court did not err in its interpretation of the parties' contract. The contract itself expressly provides for attorney's fees to be paid by Tunney, who is identified in the contract as "Client," to Mr. Pirtle. The question raised by Tunney is instead whether the contract limits Tunney's responsibilities to pay attorney fees in the event of a breach by Tunney to circumstances in which Tunney failed to pay an invoice. The language of the attorney's fees provision is expansive in scope, providing "Client shall pay all costs of collection, including without limitation, reasonable attorney fees." Tunney insists the sentence prior to attorney fee provision, nevertheless, limits the recovery of attorney fees to those circumstances in which an invoice has not been paid when due. In essence, Tunney asks the court to disregard the plain language of the attorney fee provision itself in favor of a contextual reading in light of the prior sentence. The attorney fee provision contains no words or phrases that incorporate such a limitation. There is no carryover language referencing, for example, costs of collection for "unpaid invoices" or "these" or "such" costs. To the contrary, the language is stated in an incredibly expansive manner requiring payment of "all costs of collection" and that this payment is to include "without limitation, reasonable attorney fees." Furthermore, though Tunney's contextual reading looks beyond the attorney fee provision, Tunney's argument fails to consider the broader context of this whole section of the parties' agreement. The entire section of the contract is addressed to

the whole "**PAYMENT**" under the contract and is addressed to payment for entire "total sum of $120,000.00." Whether viewed in relation to the express language of the attorney fee provision of the contract, which expressly provides for attorney's fees, or a broader contextual reading, the language of the contract is consistent with the trial court's reading of the attorney fee provision. We find no error by the trial court.

In his briefing on appeal, Mr. Pirtle has, pursuant to the contract, requested his attorney's fees for this appeal. Under the terms of the contract, we conclude that this request is proper and remand to the trial court for a determination of the appropriate amount of attorney's fees, limiting the fees to the portion related to the breach of contract claim, as the trial court did below. *See Eberbach v. Eberbach*, 535 S.W.3d 467, 478 (Tenn. 2017) (holding that so long as an agreement is valid and enforceable, it must be enforced as written regardless of whether the parties are before a trial court or an appellate court).

V.

Lastly, we address Tunney's argument that the trial court erred in awarding Mr. Pirtle $65,000 for the excavation work under a quantum meruit or unjust enrichment theory. Tunney does not argue that the elements of quantum meruit or unjust enrichment are not met, but rather, that the amount awarded was unreasonable. Tunney's argument is not an attack on the trial court award in narrow particulars but instead a big picture disagreement with the trial court's utilization of a per-load-grading based valuation rather than a consideration of Mr. Pirtle's profit margin, which Tunney insists is excessive.

The measure of damages for a quantum meruit claim is the actual value of the services provided. *In re Est. of Marks*, 187 S.W.3d 21, 32 (Tenn. Ct. App. 2005) (citing *Mitch Grissim & Assocs. v. Blue Cross Blue Shield of Tenn.*, 114 S.W.3d 531, 537 (Tenn. Ct. App. 2002)). As this court has stated,

> The evidence of the value of the services provided need not be exact. An estimation of the value of the services will suffice, *Adams v. Underwood*, 470 S.W.2d 180, 184 (1971), as long as it is sufficiently precise to enable the fact-finder to avoid a highly speculative assessment of damages. *Peters v. Michael Constr. Co.*, 688 S.W.2d 81, 85 (Tenn. Ct. App. 1984).

*Id.* The amount awarded as damages may be based on the "prevailing customs and practices" in the industry. *Blount Mem'l Hosp. v. Glasgow*, No. E2019-00776-COA-R3-CV, 2020 WL 4809951, at *2 (Tenn. Ct. App. Aug. 18, 2020) (quoting *In re Est. of Marks*, 187 S.W.3d at 32). The amount of damages awarded is a question of fact so long as the amount awarded is within the limits set by the law. *Memphis Light, Gas & Water Div. v. Starkey*, 244 S.W.3d 344, 352 (Tenn. Ct. App. 2007). In a non-jury trial, we review the amount of damages awarded with a presumption of correctness, unless the preponderance of the evidence demonstrates otherwise. *Id.* Additionally, as stated by the Tennessee

Supreme Court, "[w]hen it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). In conducting this deferential review, "a trial court's determination of credibility will not be overturned on appeal unless there is clear and convincing evidence to the contrary." *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 515 (Tenn. 2012).

The trial court engaged in a thorough examination of the testimony and made detailed findings in connection with the expert testimony regarding the valuation of the excavation and grading work. The trial court arrived at the amount awarded based upon a per load hauled rate in connection with the type of grading performed. The testimony of Mr. Pirtle's expert, Mr. Hoover, proved critical in reaching this conclusion. The trial court specifically rejected Tunney's markup approach, finding that it was not a reasonable way to calculate the value because "different contractors can perform work with different labor or equipment," necessarily changing the valuation. Instead, the trial court found, based on the expert testimony before it, that the industry standard method was charging per load. Furthermore, Mr. Hoover, as well as Tunney's experts, all testified that it would also be reasonable to charge a higher fee when a job is expedited.

The trial court noted multiple concerns with the testimony of Tunney's experts. Regarding John Rankin, one of Tunney's experts, the trial court observed that "[Mr.] Pirtle's counsel effectively impeached [Mr.] Rankin's credibility based upon his deposition and trial testimony, as well as demonstrating his close relationship with Mr. Tunney and the lack of reliable details in his valuation." Ultimately, the court did not credit Mr. Rankin's valuation. As for Tunney's other expert, Mr. Derek Preston, in addition to noting Mr. Preston's other work for Tunney and desire for additional work, the trial court expressed concern that his load estimate was not even based upon the proper size truck that was actually used by Mr. Pirtle and that his estimate did not address the extent of the grading on the project. The trial court found Mr. Hoover's testimony to be "most reliable given his depth of experience in excavating and grading, his lack of relationship with either party, and his consideration of all relevant factors of the actual work at issue in this dispute." Drawing upon Mr. Hoover's testimony, the trial court set the amount based upon the work performed at $63,525. Reflecting on the expert's consensus that an expedited job would warrant an increased payment, the trial court added a markup of $1,475 for the expedited nature of the work, raising the total to $65,000.

From our review of the record and the trial court's findings under the applicable standard of review, we conclude that the trial court did not err in awarding $65,000 in connection with the excavation and grading work performed by Mr. Pirtle.

## VI.

For the foregoing reasons, we affirm the judgment of the trial court. The costs of the appeal are taxed to the Appellants for which execution may issue if necessary. We also remand for a determination of reasonable attorney's fees to be awarded to Mr. Pirtle in relation to this appeal pursuant to the contract.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE